No. 23-1781

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

SACRED HEART OF JESUS PARISH, GRAND RAPIDS; JERRY HATLEY; ROBIN HATLEY; JOSEPH BOUTELL; RENEE BOUTELL; PETER UGOLINI; KATIE UGOLINI,

*Plaintiffs-Appellants,*

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JOHN E. JOHNSON, JR., in his official capacity as Executive Director of the Michigan Department of Civil Rights; et al.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:22-cv-01214

---

## OPENING BRIEF OF APPELLANTS

---

Cody S. Barnett
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

David A. Cortman
Ryan J. Tucker
Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
dcortman@ADFlegal.org
rtucker@ADFlegal.org
kanderson@ADFlegal.org

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1 and 6th Cir. R. 26.1(a), Plaintiffs-Appellants state that they have no parent corporation, do not issue stock, are not subsidiaries or affiliates of a publicly owned corporation, and there is no publicly owned corporation or its affiliate, not a party to this appeal, that has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................i

Table of Authorities.................................................................................v

Statement in Support of Oral Argument.....................................................1

Statement of Jurisdiction.........................................................................2

Statement of Issues.................................................................................3

Statement of the Case.............................................................................4

I.    Sacred Heart Academy was founded to help parents form
      their children in the Catholic faith by providing a classical
      Catholic education...........................................................................4

II.   Parents send their children to Sacred Heart for the holistic
      Catholic education it provides. ........................................................7

III.  Recent amendments to Michigan law would undermine
      Sacred Heart's religious autonomy and require it to violate
      its religious beliefs.........................................................................9

      A.    The Elliott-Larsen Civil Rights Act broadly covers
            religious schools like Sacred Heart. ........................................9

      B.    Michigan amends the Act's list of protected
            characteristics to include sexual orientation and
            gender identity. .................................................................12

      C.    Against this backdrop of aggressive enforcement,
            Sacred Heart and parents sue to vindicate their
            constitutional rights............................................................17

Standard of Review...............................................................................18

Summary of the Argument.....................................................................19

Argument.............................................................................................21

I.   Sacred Heart and Parents have standing to challenge Michigan's laws. ................................................................21

     A.   Sacred Heart wants to exercise its First Amendment rights in ways the Act arguably prohibits. ..........................22

         1.   The Employment Provision violates Sacred Heart's religious autonomy and free association rights. ..................................................................23

         2.   The Education Provision prevents Sacred Heart from fully transmitting the Catholic faith to its students. ................................................................27

         3.   Michigan's Accommodation Provision compels Sacred Heart's speech and violates its sincere religious convictions. ....................................29

         4.   The Act contains multiple Publication Bans that chill and censor Sacred Heart's speech. ......................31

     B.   Sacred Heart has refrained from speaking lest Michigan enforce its laws. ......................................32

     C.   The "surrounding circumstances" demonstrate that Sacred Heart has a credible fear that Michigan will enforce its laws. ..................................................33

         1.   Michigan vigorously enforces its laws. ......................35

         2.   Michigan's laws are easy to enforce and can be done so by someone outside the State apparatus. .......39

         3.   Michigan refuses to disavow enforcement against Sacred Heart. ..............................................41

     D.   The district court inappropriately invoked hypothetical exemptions to reject Sacred Heart's standing. ....................43

         1.   Savings clauses like those in Michigan's laws cannot defeat standing *ex ante*. ....................................43

2.    The scant possibility that Michigan could grant Sacred Heart a BFOQ does not defeat standing. ........ 46

II.    Sacred Heart is entitled to a preliminary injunction because it is likely to succeed on the merits. ................................ 49

A.    The Act violates Sacred Heart's free speech rights. ............ 50

1.    The Accommodation Provision impermissibly compels Sacred Heart's speech .................................. 50

2.    The Publication Bans censor Sacred Heart's speech based on content and viewpoint. ..................... 51

B.    The Act violates Sacred Heart's free-exercise rights and religious autonomy. ............................................... 53

1.    The Act forces Sacred Heart to hire employees and retain students contrary to the Catholic faith. ................................................................. 53

2.    The Act forces Sacred Heart to adopt policies that violate its Catholic faith. ............................... 55

C.    Michigan's laws violate Parents' fundamental parental rights. .............................................................. 56

D.    As applied to Sacred Heart, Michigan's Act cannot survive strict scrutiny. .......................................... 57

III.    The remaining factors favor preliminarily enjoining the Act. ...... 60

Conclusion ................................................................. 60

Certificate of Compliance ....................................... 62

Certificate of Service ............................................. 63

Designation of Relevant District Court Documents .............................. 64

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ........................................................... 40, 50, 51

*AES-Apex Employer Services v. Rotondo,*
   924 F.3d 857 (6th Cir. 2019) ...................................................... 18

*Babbitt v. United Farm Workers National Union,*
   442 U.S. 289 (1979) ................................................................ 46

*Barbour v. Department of Social Services,*
   497 N.W.2d 216 (Mich. Ct. App. 1993) ........................................... 13

*Barr v. American Association of Political Consultants, Inc.,*
   140 S. Ct. 2335 (2020) ............................................................ 53

*Barrett v. Steubenville City School,*
   388 F.3d 967 (6th Cir. 2004) ...................................................... 22

*Bays v. City of Fairborn,*
   668 F.3d 814 (6th Cir. 2012) ...................................................... 60

*Bennett v. Metropolitan Government of Nashville & Davidson County,*
   977 F.3d 530 (6th Cir. 2020) ...................................................... 58

*Block v. Canepa,*
   74 F.4th 400 (6th Cir. 2023) ....................................................... 37

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) ............................................................ 11

*Bouldin v. Alexander,*
   82 U.S. (15 Wall.) 131 (1872) ..................................................... 25

*Bouye v. Bruce,*
   61 F.4th 485 (6th Cir. 2023) ....................................................... 18

*Boy Scouts of America v. Dale,*
   530 U.S. 640 (2000) .......................................................... 23, 24, 40

*Buck v. Gordon*,
    429 F. Supp. 3d 447 (W.D. Mich. 2019) ................................... 15, 35

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ........................................................ 54

*Christian Legal Society v. Walker*,
    453 F.3d 853 (7th Cir. 2006) .............................................. 26

*Clarke v. K Mart Corporation*,
    495 N.W.2d 820 (Mich. Ct. App. 1992) ..................................... 30

*Colorado Union of Taxpayers, Inc. v. Griswold*,
    2023 WL 5426581 (10th Cir. Aug. 23, 2023) ................................ 33

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
    483 U.S. 327 (1987) ....................................................... 24

*Crawford v. United States Department of Treasury*,
    868 F.3d 438 (6th Cir. 2017) ............................................... 3

*Dambrot v. Central Michigan University*,
    55 F.3d 1177 (6th Cir. 1995) .............................................. 45

*Davis v. Colerain Township*,
    51 F.4th 164 (6th Cir. 2022) .............................................. 22

*Doster v. Kendall*,
    54 F.4th 398 (6th Cir. 2022) .............................................. 49

*Duquesne University of the Holy Spirit v. NLRB*,
    947 F.3d 824 (D.C. Cir. 2020) ............................................. 48

*EEOC v. Roman Catholic Diocese of Raleigh*,
    213 F.3d 795 (4th Cir. 2000) .............................................. 53

*Elrod v. Burns*,
    427 U.S. 347 (1976) ....................................................... 60

*FEC v. Cruz*,
    596 U.S. 289 (2022) ................................................... 45, 46

*Fischer v. Thomas,*
  52 F.4th 303 (6th Cir. 2022)..........................................................34

*Fischer v. Thomas,*
  78 F.4th 864 (6th Cir. 2023)..........................................................50

*Franciscan Alliance, Inc. v. Becerra,*
  47 F.4th 368 (5th Cir. 2022)..........................................................41

*G & V Lounge, Inc. v. Michigan Liquor Control Commission,*
  23 F.3d 1071 (6th Cir. 1994) ..................................................33, 60

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) ......................................................................58

*Greenberg v. Lehocky,*
  81 F.4th 376 (3d Cir. 2023) ..........................................................41

*Hall v. Baptist Memorial Health Care Corporation,*
  215 F.3d 618 (6th Cir. 2000) ........................................................25

*Haynes v. Neshewat,*
  729 N.W.2d 488 (Mich. 2007)........................................................29

*Hormel v. Helvering,*
  312 U.S. 552 (1941) ......................................................................50

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
  565 U.S. 171 (2012) ................................................23, 24, 25, 47, 54

*Janus v. American Federation of State, County, & Municipal
  Employees, Council 31,*
  138 S. Ct. 2448 (2018) ..................................................................50

*KenAmerican Resources, Inc. v. United States Secretary of Labor,*
  33 F.4th 884 (6th Cir. 2022)..........................................................51

*Kentucky v. Yellen,*
  54 F.4th 325 (6th Cir. 2022)..........................................................22

*L.W. ex rel. Williams v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023)..........................................................11

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
  138 S. Ct. 1719 (2018) ............................................................... 38, 40

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ......................................................................... 52

*McKay v. Federspiel*,
  823 F.3d 862 (6th Cir. 2016) ........................................ 18, 34, 39, 40

*McLeod v. Providence Christian School*,
  408 N.W.2d 146 (Mich. Ct. App. 1987) ........................................... 38

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) .................................................... 50, 51

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ......................................................................... 56

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010) ......................................................................... 41

*North Carolina Right to Life, Inc. v. Bartlett*,
  168 F.3d 705 (4th Cir. 1999) .................................................... 42, 49

*Online Merchants Guild v. Cameron*,
  995 F.3d 540 (6th Cir. 2021) .................................................... 34, 36

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ......................................................... 52

*Our Lady of Guadalupe School v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) .................................... 4, 5, 23, 25, 28, 47, 54

*Peck v. McCann*,
  43 F.4th 1116 (10th Cir. 2022)................................................... 19, 33

*Picard v. Magliano*,
  42 F.4th 89 (2d Cir. 2022) .............................................................. 22

*Pierce v. Society of Sisters of the Holy Names of Jesus & Mary*,
  268 U.S. 510 (1925) ......................................................................... 56

*Platt v. Board of Commissioners on Grievances & Discipline of Ohio Supreme Court*,
769 F.3d 447 (6th Cir. 2014) ........................................................... 41

*Porth v. Roman Catholic Diocese of Kalamazoo*,
532 N.W.2d 195 (Mich. Ct. App. 1995) .......................................... 38

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ................................................................... 52, 57

*Rayburn v. General Conference of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985) ......................................................... 54

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ................................................................... 52, 53

*Republican Party of Minnesota v. White*,
416 F.3d 738 (8th Cir. 2005) ........................................................... 59

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) ........................................................................ 52

*Rouch World, LLC v. Department of Civil Rights*,
987 N.W.2d 501 (Mich. 2022) ................................................... 11, 14

*Seattle's Union Gospel Mission v. Woods*,
142 S. Ct. 1094 (2022) ................................................................... 25

*Serbian Eastern Orthodox Diocese for U.S.A. & Canada v. Milivojevich*,
426 U.S. 696 (1976) ........................................................................ 54

*Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Company*,
860 F.3d 844 (6th Cir. 2017) ........................................................... 18

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) ........................................................... 33

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ..................................................... 18, 37

*Stryker Employment Company, LLC v. Abbas,*
    60 F.4th 372 (6th Cir. 2023) ........................................................... 18

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...................................................... 21, 22, 39, 44

*Telescope Media Group v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) .......................................................... 30

*Tingley v. Ferguson,*
    57 F.4th 1072 (9th Cir. 2023) ......................................................... 58

*Troxel v. Granville,*
    530 U.S. 57 (2000) ......................................................................... 56

*Turtle Island Foods, S.P.C. v. Strain,*
    65 F.4th 211 (5th Cir. 2023) .......................................................... 42

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority,*
    163 F.3d 341 (6th Cir. 1998) .......................................................... 60

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000) ....................................................................... 59

*United States v. Stevens,*
    559 U.S. 460 (2010) ....................................................................... 48

*United States v. Supreme Court of New Mexico,*
    839 F.3d 888 (10th Cir. 2016) ........................................................ 33

*Universal Life Church Monastery Storehouse v. Nabors,*
    35 F.4th 1021 (6th Cir. 2022) .................................................... 33, 36

*Virginia v. American Booksellers Association, Inc.,*
    484 U.S. 383 (1988) ....................................................................... 22

*Vitagliano v. County of Westchester,*
    71 F.4th 130 (2d Cir. 2023) ............................................................ 36

*Ward v. Utah,*
    321 F.3d 1263 (10th Cir. 2003) ...................................................... 21

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ...................................................................... 56

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1871) .............................................. 24, 54

*Weishuhn v. Lansing Catholic Diocese*,
    787 N.W.2d 513 (Mich. Ct. App. 2010) ..................................... 38

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................... 53, 54, 56, 57

*Wollschlaeger v. Governor of Florida*,
    848 F.3d 1293 (11th Cir. 2017) ................................................... 41

## **Statutes**

42 U.S.C. § 2000e-1 ............................................................................. 59

MCL 37.2102 ................................................................................ 10, 29

MCL 37.2202 ................................................................................ 10, 25

MCL 37.2206 ........................................................................ 12, 26, 31

MCL 37.2208 ................................................................................ 10, 47

MCL 37.2302 ........................................................ 10, 12, 29, 31, 43

MCL 37.2402 ........................................................................ 10, 27, 31

MCL 37.2602 ...................................................................................... 39

MCL 37.2605 ........................................................................ 26, 29, 39

MCL 37.2607 ...................................................................................... 28

MCL 37.2705 ...................................................................................... 43

MCL 750.146 ............................................................................... 11, 43

MCL 750.147 ......................................................................... 11, 12, 31, 40

Ohio Rev. Code Ann. § 4112.02 ...............................................................59

**Other Authorities**

Catechism of the Catholic Church .........................................................57

Helen M. Alvare, *Church Autonomy After* Our Lady of Guadalupe
School: *Too Broad? Or Broad As It Needs to Be?*, 25 Tex. Rev. L.
& Pol. 319 (2021) ...............................................................................26

MCRC Annual Report ............................................................................35

Michigan Department of Civil Rights, Complaint Request...................39

Order, Amend. of MCR 1.109, Mich. Sup. Ct. (Sept. 27, 2023) ..............30

Pope John Paul II, *Gratissimam Sane*, Letter to Families (1994).........57

Press Release, AG Nessel Prevails in ELCRA Case (July 28, 2022) .....14

S.B. 4, 102d Leg., Reg. Sess. (Mich. 2023)...............................................14

Sara Boboltz, *This Michigan Hair Salon Owner Will Apparently
Refuse Trans and Queer Clients*, HuffPost, July 11, 2023 ............16

Senate Comm. Test. 25:00–25:10 (Feb. 2, 2023) ....................................15

*The American Heritage Dictionary* (1976)..............................................13

The Federalist No. 51 (J. Madison) ........................................................46

Tim Skubick, *Who is Elliott and Who is Larsen? Groundbreakers,
That's Who*, MLive (Apr 3, 2019) ....................................................13

**Rules**

MDCR 37.11...............................................................................................39

MDCR 37.14...............................................................................................39

MDCR 37.25...............................................................................................47

MDCR 37.4.................................................................................................39

## <u>Constitutional Provisions</u>

U.S. Const. art. VI, para. 2.........................................................................44

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants Sacred Heart and Parents Jerry and Robin Hatley, Joseph and Renee Boutell, and Peter and Katie Ugolini respectfully request oral argument. Sacred Heart operates a classical Catholic pre-kindergarten through twelfth-grade school, the only of its kind in the region. Parents have several children that attend Sacred Heart precisely because it seeks to cultivate a holistic Catholic community. To create that community, Sacred Heart must hire employees and recruit students who agree with the Catholic Church's doctrines, including those on sexuality and gender. But Michigan's recent interpretations of its civil rights laws threaten the school's autonomy to do so. These laws imminently threaten Sacred Heart's free-speech rights, free-exercise rights, and religious autonomy as protected by the First Amendment.

Yet the district court concluded that Sacred Heart and Parents lacked standing. The court thought that Sacred Heart did not face a credible threat of prosecution because the school *might* qualify for *some* exemptions for *some* of its constitutional activities. In reaching this conclusion, the district court misapplied this Court's jurisprudence. Oral argument will aid this Court in resolving the appropriate standard for pre-enforcement standing and the propriety of a preliminary injunction.

## STATEMENT OF JURISDICTION

Sacred Heart and Parents raised claims under the First and Fourteenth Amendments to the United States Constitution. The district court had jurisdiction under 28 U.S.C. § 1331. Moreover, the district court had jurisdiction over the requested injunctive relief under 28 U.S.C. § 1343.

The district court entered a final judgment, denying both Sacred Heart's motion to file a supplemental brief and its request for injunctive relief, and ultimately dismissing Sacred Heart and Parents' claims. Order, R.44, PageID#954–55, 961. Sacred Heart and Parents timely filed a notice of appeal on August 23, 2023. Notice of Appeal, R.46, PageID#963. This Court has jurisdiction under 28 U.S.C. §§ 1291–92.

## STATEMENT OF ISSUES

When state laws infringe on First Amendment liberties, the Constitution does not require plaintiffs to risk arrest first and defend later. Instead, a plaintiff can bring a pre-enforcement challenge if he can demonstrate "a substantial probability" that he will "engage in conduct that is arguably affected with a constitutional interest" and faces a credible "threat of prosecution if [he] does indeed engage in that conduct." *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454–55 (6th Cir. 2017) (cleaned up).  The questions presented are:

1.    Whether Sacred Heart and Parents have standing when Michigan vigorously enforces its anti-discrimination laws, including against religious organizations, and refuses to disavow enforcement against Sacred Heart.

2.    Whether Sacred Heart and Parents are entitled to a preliminary injunction against laws that would force the school to use pronouns it disagrees with, hire employees at odds with its teaching, recruit students who won't agree to conform to Church doctrine, and allow students to use restrooms, wear uniforms, and play on sports teams that do not align with their sex, all violating the school's First Amendment rights and Parents' fundamental right to educate their children consistent with their faith.

## STATEMENT OF THE CASE

**I.    Sacred Heart Academy was founded to help parents form their children in the Catholic faith by providing a classical Catholic education.**

Over a century ago, Polish immigrants working in gypsum mines on Grand Rapids' west side founded Sacred Heart of Jesus Parish to serve Catholic families and "restore all things in Christ." Compl., R.1, PageID#5. As part of that mission, the Parish established Sacred Heart Academy, a classical Catholic pre-kindergarten through twelfth-grade school. The only school of its kind in the region, Sacred Heart strives to "recover the Beauty ever ancient, ever new through an integrated curricula that forms the whole person inspiring the hearts of Catholic students to know, love[,] and serve God." *Id.*, PageID#6. This curriculum specifically focuses on "a Christ-centered education based in the Word of God" to "support parents in forming their children in the Catholic faith." *Id.*, PageID#6.

Like all Catholic schools, Sacred Heart's curriculum is "intimately bound up with the whole of the Church's life." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065 (2020) (cleaned up). Sacred Heart intentionally cultivates "an authentic Christian communit[y] animated by the spirit of Jesus Christ" that educates children in an environment where the Catholic faith and its doctrines are taught, lived, and modeled. Compl., R.1, PageID#6. It "works to help all students"—including those "who struggle with gender

4

discordance"—"find their identity in Christ as beloved sons or daughters of God." *Id.*, PageID#14. Unlike public schools, Sacred Heart does more than teach its students on certain subjects; it helps form them as Catholic women and men. Everything at Sacred Heart aims to advance the "core … mission" of "[e]ducating and forming students in the Catholic faith." *Our Lady of Guadalupe*, 140 S. Ct. at 2066. And it relies on its faculty and staff to transmit the Church's doctrines in both word and deed.

Sacred Heart accepts all students, regardless of religious background. But it requires all students to live in accordance with the Catholic faith, as detailed in the student handbook. Similarly, Sacred Heart requires "all employees to become certified catechists—*i.e.*, to be certified to teach the Catholic faith." Compl., R.1, PageID#9. They must "support, live out, [and] model" the Catholic faith and its doctrines. *Id.*, PageID#9. Each employee annually signs a "memorandum of understanding" that outlines their religious and moral duties; they also publicly swear an "oath of fidelity" to Church teaching at a Mass. *Id.*, PageID#9.

That fidelity includes what the Church teaches on human anthropology, marriage, and sexuality. The Church "exists to make the living Christ present in the world today, and to provide onlookers with a glimpse of a society of persons living as disciples of Jesus Christ." *Id.*, PageID#11. This community, the Church believes, "promotes the best

vision of human flourishing." *Id.*, PageID#11. Since the Church "teaches that proper love of God and neighbor must be rooted in truth," the Church's views on anthropology, sexuality, and marriage are critical to forming a proper "society … of persons" where humans beings truly flourish. *Id.*, PageID#11.

As to anthropology, the Church teaches that "God created man in His own image … male and female he created them." *Id.*, PageID#11. As such, "Catholic faith rejects the notion that a man or woman can 'transition' to a gender inconsistent with his or her biological sex." *Id.*, PageID#12. And it does not accommodate "using pronouns or bathrooms inconsistent with … biological sex," believing such practices contrary to Truth and "the Catholic vision of the human person and human flourishing." *Id.*, PageID#13. Instead, Catholic schools like Sacred Heart "model authentic masculinity and femininity by demonstrating to young boys and girls what it means to be a Catholic man or woman," respectively. *Id.*, PageID#12–13.

The Church reinforces similar teachings about sexuality and marriage. Catholic doctrine stresses that "human sexuality is a unitive and procreative gift reflecting the nature of God," that "sexual acts are exclusively reserved for the loving and permanent bond of marriage," and that such a bond "can only exist between one man and one woman." *Id.*, PageID#11. "[A]ll sexual activity outside of marriage is gravely sinful" and does not promote "human flourishing." *Id.*, PageID#11.

To live out its religious identity faithfully, Sacred Heart cannot "embrace transgender ideology" or "a vision of marriage and human sexuality that is inconsistent with Catholic doctrine." *Id.*, PageID#15. To do so would "undermine the Church's vision of human flourishing"; it would also actively entangle Sacred Heart in behaviors it believes to be sinful. *Id.*, PageID#15–16. And that would defeat the school's mission to create an environment where children are educated in a Catholic ethos.

Sacred Heart teaches these doctrines and also maintains several practices that reinforce them. For instance, the school assigns students into single-sex "households" that aim to foster community, train older students in leadership, provide mentorship for younger students, and generally assist students in flourishing as the authentic men and women God created them to be. These households are divided strictly according to sex and not a student's self-proclaimed gender identity. So are Sacred Heart's restrooms, locker rooms, and sports teams.

## II.    Parents send their children to Sacred Heart for the holistic Catholic education it provides.

Many parents choose Sacred Heart precisely because it ascribes to this idea of human flourishing. Of the Hatley's nine children, six currently attend the Academy so Jerry and Robin "can fulfill their religious obligation to teach their children in the Catholic faith." Compl., R.1, PageID#17. They do this despite logistical and financial sacrifices. The Hatleys believe that through the Academy and the intentional

community it cultivates, their children "can receive a rich moral and spiritual foundation as part of their academic formation." *Id.*, PageID#18.

Joe and Renee Boutell also send their five adopted children to the Academy. For the Boutells, "the truth, goodness, and beauty of the holistic Catholic education at Sacred Heart outweighed any" challenges, whether they be academic, financial, or logistic. *Id.*, PageID#19–20. "The unique Catholic community at Sacred Heart … foster[s] a true spirit of charity that aids the Boutell children in living out and experiencing their Catholic faith." *Id.*, PageID#20.

So, too, for Peter and Katie Ugolini. Their three youngest children attend Sacred Heart. The Ugolinis chose the Academy because to them, "the Catholic faith is paramount and permeates every aspect of the academics, community, and culture." *Id.*, PageID#22. They value the "authentic Catholic message" their children hear and see lived out at Sacred Heart—so much so that they eschew "one of the best public high schools in the state" right across the street from their house in favor of Sacred Heart. *Id.*, PageID#22.

The Hatleys, Boutells, and Ugolinis all chose Sacred Heart because they "believe it is their religious and moral obligation to help their children know, love, and serve God in this world and be happy with Him forever in Heaven." *Id.*, PageID#24. They all "believe all the teachings of the Catholic Church, including the Church's teaching on

marriage and sexuality, and they are raising their children in the Catholic faith." *Id.*, PageID#24.

It is "essential to their children's spiritual well-being that their children be surrounded by a true, good, and beautiful Catholic culture at school where students, teachers, priests, and families all strive for holiness together." *Id.*, PageID#25. For Parents, Sacred Heart represents an alternative to public schools that do not model the life that Parents desire for their children.

Yet recent changes in Michigan law now threaten Sacred Heart's very existence.

## III. Recent amendments to Michigan law would undermine Sacred Heart's religious autonomy and require it to violate its religious beliefs.

### A. The Elliott-Larsen Civil Rights Act broadly covers religious schools like Sacred Heart.

In 1976, Michigan enacted the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*, a broad-reaching law that prohibits discrimination on a variety of bases. Unlike most similar state laws, Michigan's Act does not exempt religious organizations, so Sacred Heart falls within its ambit. After the Michigan Legislature expanded the law to apply to sexual orientation and gender identity, the Act constrains Sacred Heart from fulfilling its mission in multiple ways.

*The Employment Provision.* The Act's Employment Provision prohibits employers, like Sacred Heart, from making employment

decisions "because of" protected traits. MCL 37.2102(1). This Provision covers a wide range of employment decisions, including recruiting, hiring, disciplining, terminating, and retaining employees (and, for good measure, any other decision that might "adversely affect[ ]" an employee). MCL 37.2202(1).

Employers can apply to the Michigan Civil Rights Commission for a "bona fide occupational qualification" (BFOQ) exemption. But this exemption applies only if the applicant sufficiently demonstrates to the Commission that decisions based on protected traits are "reasonably necessary to the normal operation of the business or enterprise." MCL 37.2208. The Commission retains the discretion to grant or deny the request, and a grant must be renewed every five years.

*The Education Provision.* Just as the Employment Provision prohibits employers from making certain decisions based on protected traits, so does the Education Provision prohibit educators from taking certain actions based on those traits. MCL 37.2402(b). A school like Sacred Heart cannot factor these protected traits for admission, retention, or disciplinary purposes. *Id.*

*The Accommodation Provision.* The Act's Accommodation Provision prohibits public accommodations from denying "equal enjoyment" and "equal utilization" of their services "because of" protected characteristics. MCL 37.2302(a); MCL 37.2102(1). The Provision further prohibits "patterns of practices" that differentiate based on these characteristics.

Collectively, then, the Accommodation Provision bans outright denials *and* any differentiation in a service if such actions are "because of" a protected characteristic.

The Michigan Supreme Court interprets "because of" broadly to include any situation "where the discriminatory action would not have occurred but for the [protected trait] of the complainant." *Rouch World, LLC v. Dep't of C.R.*, 987 N.W.2d 501, 512 (Mich. 2022). Michigan grafted this standard onto the Accommodation Provision from *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), even though *Bostock*'s "text-driven reasoning applies only to Title VII," *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023).

Michigan's Penal Code contains another provision, the Equal Accommodations Act, that bars public accommodations from denying "full and equal accommodations," MCL 750.146, "on account of … sex," MCL 750.147. Unlike the ELCRA, the Equal Accommodations Act does allow religious institutions to separate "restrooms and locker facilities … according to sex." MCL 750.146. But that exemption would not cover pronoun policies. *See* Argument §§ I.A.3, II.A.1. To the extent Sacred Heart is a public accommodation, its challenges against the ELCRA also apply to the EAA.

*Publication Bans.* Finally, the Act prohibits employers, educational institutions, and public accommodations from publishing or communicating certain statements. Employers cannot post job

11

announcements that indicate a preference "based on" protected characteristics. MCL 37.2206(1)–(2). Nor can employers ask prospective employees about "information concerning" protected characteristics; they can't even enact written policies related to those characteristics.

Similarly, public accommodations cannot publish statements or policies that "indicate[ ] that the full and equal enjoyment of" the accommodation will be denied; they cannot say anything that indicates that anyone is "objectionable, unwelcome, unacceptable, or undesirable" based on protected characteristics. MCL 37.2302(b); MCL 750.147.

### B.    Michigan amends the Act's list of protected characteristics to include sexual orientation and gender identity.

Over the last several years, Michigan officials have tried to expand the Act's coverage to include sexual orientation and gender identity, all while denying the religious accommodations found in similar provisions in other states.

In 2018, for instance, Michigan's Commission adopted Interpretative Statement 2018–1, which read the Act's prohibition on sex discrimination to *also* include decisions based on sexual orientation and gender identity. (This, despite years of case law—and strong probative evidence of the Act's original public meaning—saying the contrary.[1]

---

[1] Virtually every dictionary in 1976—the year the Michigan Legislature passed the Act—defines sex as the biological status of male or female.

*Barbour v. Dep't of Social Servs.*, 497 N.W.2d 216, 218 (Mich. Ct. App. 1993) (per curiam)). This Interpretative Statement led the Commission to subsequently investigate over 73 different complaints filed within a year. Compl., R.1, PageID#44.

Among those investigations were two businesses that, for religious reasons, allegedly discriminated based on sexual orientation and gender identity. These businesses challenged the Interpretative Statement's conclusion that "sex," as used in the Act, encompasses sexual orientation or gender identity. And both business owners argued that providing the requested services would violate their religious convictions about marriage and the immutability of sex. Michigan disregarded these sincere objections and, in its investigation, ordered the businesses to

---

*E.g.*, *Sex*, *The American Heritage Dictionary* 1187 (1976) (defining sex as "[t]he property or quality by which organisms are classified according to their reproductive functions"). Far from being synonymous with sex, the terms "sexual orientation" and "gender identity" have different meanings—meanings used in *contrast* with sex to communicate distinct concepts. Indeed, the Act never would have passed the Michigan House if it covered sexual orientation or gender identity. Tim Skubick, *Who is Elliott and Who is Larsen? Groundbreakers, That's Who*, MLive (Apr. 3, 2019), https://perma.cc/BB88-9RXL ("[W]hen the [Act] did pass, it came down to practical political calculus. Put gays in the measure and the whole thing implodes. Leave them out, and the bill passes.").

In light of this evidence, the Commission's own counsel warned that the Interpretative Statement was "unlawful" and that the Commission could not apply the Act "in a manner that infringes on the constitutionally protected practice of religion." App. in Supp. of Pls.' Opp'n to Mot. to Dismiss, R.29-4, PageID#700, 707. Counsel's advice went unheeded.

respond to invasive questions and document requests. Michigan took the position that the business owners' sincere religious convictions did "not allow [them] to deny protected persons equal access to goods and services under a neutral and generally applicable" law like the Accommodations Provision. App. in Supp. of Pls.' Opp'n to Mot. to Dismiss, R.29-4, PageID#595.

The Michigan Supreme Court *de facto* amended the Act, holding that "discrimination on the basis of sexual orientation necessarily involves discrimination because of sex in violation of [the Act]." *Rouch World*, 987 N.W.2d at 513. A dissenting justice warned about the harms that such a reinterpretation would impose on religious organizations. *Id.* at 556 (Viviano, J., dissenting). He criticized the majority for embracing an "interpretation [that] violates constitutional protections of religious liberty." *Id.*

Unsatisfied, Michigan Attorney General Dana Nessel and the Commission pressed the state legislature to codify the Supreme Court's holding. Press Release, AG Nessel Prevails in ELCRA Case (July 28, 2022), https://perma.cc/9MXY-H4BM. The legislature did so, amending the Act to prohibit discrimination because of "sexual orientation" and "gender identity or expression." S.B. 4, 102d Leg., Reg. Sess. (Mich. 2023). The legislature rejected every proposed religious exemption, with one legislator proclaiming, "Bigotry under a veneer of religion is still bigotry." App. in Supp. of Pls.' Opp'n to Mot. to Dismiss, R.29-4,

14

PageID#694. Commissioner Luke Londo agreed, advocating that "it should be illegal to discriminate against someone on the basis of sexual orientation, gender identity and expression *even if it conflicts with their own religious beliefs*." Senate Comm. Test. 25:00–25:10 (Feb. 2, 2023) (emphasis added), https://bit.ly/3KdEkh8.

Before the ink dried on these amendments, Attorney General Nessel was aggressively advocating enforcement. She campaigned on the principle that Catholic views on marriage constitute "hate" and opposed a Michigan law protecting the religious liberty rights of adoption and foster agencies as "discriminatory animus." Compl., R.1, PageID#47. She referred to Catholic adoption agencies as "hate mongers," smeared Catholics in a snide remark about "their rosary," and maligned a Michigan judge solely for his Catholicity. *Id.*, PageID#47–48. So zealously has General Nessel pursued the religious that one federal court equated her actions with a "pretext for religious targeting." *Buck v. Gordon*, 429 F. Supp. 3d 447, 462–63 (W.D. Mich. 2019).

Attorney General Nessel has done more than malign Michiganders of faith; she has used the amended Act to bludgeon them into submission. In May 2023, for instance, Michigan started an investigation into Catholic Charities for alleged gender-identity discrimination. Ex. A to Pls.' Suppl. Br. in Opp'n to Mot. to Dismiss, R.34-2, PageID#800. The initial investigation forced Catholic Charities to

produce 12 categories of documents, including information about "all employees," training, "all other properties owned," and other documents. *Id.*, PageID#806–07.

Then, in July 2023, Michigan investigated 12 complaints against a hairstylist for a post she published on social media commenting on gender identity. Though the hairstylist never denied anyone any service, her post alone triggered the complaints and subsequent investigation. Sara Boboltz, *This Michigan Hair Salon Owner Will Apparently Refuse Trans and Queer Clients*, HuffPost, July 11, 2023, https://perma.cc/M2ZA-2TRM.

Recently, Michigan also received a complaint against a Catholic health clinic, Emmaus Health Partners, alleging gender-identity discrimination. *See* Mot. for Leave to Suppl. Record 4; Hoff. Decl. in Supp. of Mot. to Suppl. (Hoff. Decl.) Ex. 2.

In numerous cases outside Michigan, the State has likewise taken the position that its law—and others like it—supersede First Amendment liberties. For example, Michigan maintains that neither the "right of expressive association," the "doctrine of church autonomy," or the "Religious Freedom Restoration Act" protect a Catholic school's choice to terminate a substitute teacher who publicly advocated against Catholic teaching. Br. for Mass. et al. as Amici Curiae in Supp. of Pl.-Appellee at 18–25, *Billard v. Charlotte Cath. High Sch.*, No. 22-1440 (4th Cir. Nov. 30, 2022); *see also* Br. for Va. et al. as Amici Curiae in

16

Supp. of Resp'ts, *Our Lady of Guadalupe Sch. v. Morrisey-Berru*, No. 19-267 (U.S. Mar. 11, 2020).

Michigan insists that "pronoun misuse" and "repeatedly using the wrong name and pronouns" constitutes discrimination. Br. of Cal. et. al as Amici Curiae in Supp. of Neither Party, *Tennessee v. Dep't of Educ.*, No. 22-5807 (6th Cir. Dec. 22, 2022), 2022 WL 18027407, at *2, *12.

And Michigan declares that states can and should use public-accommodations laws aggressively to force website designers to create custom websites celebrating a view of marriage that contradicts the designers' beliefs. Br. for Mass. et al. as Amici Curiae in Supp. of Resp'ts, *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Aug. 19, 2022).

## C. Against this backdrop of aggressive enforcement, Sacred Heart and Parents sue to vindicate their constitutional rights.

Fearing prosecution under the amended Act, Sacred Heart and Parents sued for declaratory and injunctive relief to prevent Michigan from violating their constitutional rights. Concomitantly, Sacred Heart and Parents moved for a preliminary injunction.

The district court instead granted Michigan's motion to dismiss. The court held that Sacred Heart lacked standing to challenge the laws because the laws did not arguably proscribe Sacred Heart's activities. Because the laws must be interpreted consistently with other laws, including the First Amendment, the district court reasoned that Sacred

Heart had nothing to fear from the laws' broad application. Moreover, the court held that Sacred Heart lacked a credible fear that Michigan would enforce its law against Sacred Heart. The court hewed rigidly to the so-called standing factors in *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016), discounting that Sacred Heart satisfies those factors and can also show other relevant considerations, such as Michigan's refusal to disavow enforcement.

## STANDARD OF REVIEW

This Court reviews de novo both a dismissal based on lack of standing and the denial of a preliminary injunction based on standing. *Bouye v. Bruce*, 61 F.4th 485, 489 (6th Cir. 2023); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). Ordinarily, this Court reviews the denial of a motion to supplement a pleading for abuse of discretion. *AES-Apex Emp. Servs. v. Rotondo*, 924 F.3d 857, 867 (6th Cir. 2019). Here, however, the district court denied Sacred Heart's motion to adduce facts that further demonstrate standing, and the court did so based on its misapplication of Article III principles. This Court reviews legal errors regarding jurisdiction de novo. *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 380 (6th Cir. 2023). In any event, "a district court necessarily abuses its discretion when it commits an error of law." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 854 (6th Cir. 2017).

18

## SUMMARY OF THE ARGUMENT

Sacred Heart has standing to challenge the Act because the school's constitutional activities, including its speech and religious autonomy, are at least arguably proscribed by the Act. The Act has something to say about everything from Sacred Heart's pronoun policies to who it hires to transmit the faith. Moreover, Michigan zealously enforces the Act—even against religious organizations—and has refused to disavow enforcement against Sacred Heart. Sacred Heart has a credible fear that it will face "real consequences" simply for exercising its constitutional rights. *Peck v. McCann*, 43 F.4th 1116, 1132 (10th Cir. 2022).

The district court wrongly concluded that the Act does not encompass Sacred Heart's activities because enforcement officials are obligated to enforce the Act consistent with the Constitution. But that view would always nullify pre-enforcement challenges, which exist to vindicate constitutional rights in question *before* officials step over the line.

The district court was also wrong that Sacred Heart has not established a credible fear that Michigan will enforce the Act. The court hewed to the so-called *McKay* factors, ignoring not only that Sacred Heart satisfies those factors but also that this Court has described the factors as merely probative of a broader inquiry. Looking at that broader inquiry, the surrounding circumstances here reveal a strong

threat that Michigan will enforce the Act against Sacred Heart. Sacred Heart therefore has standing.

So do Parents. By intruding on Sacred Heart's religious autonomy, the Act indirectly burdens Parents' right to educate their children.

Moreover, Sacred Heart and Parents are likely to succeed on the merits. In countless ways, the Act proscribes Sacred Heart's constitutionally protected activities. It chills and compels Sacred Heart's speech on everything from pronoun usage to employment advertisements. It infringes on Sacred Heart's autonomy by dictating who the school can and cannot hire in furtherance of its Catholic mission. And it burdens Parents' fundamental right to send their children to a Catholic school and receive a holistic, classical education in line with the Parents' beliefs. Given these unconstitutional infringements, and the harms to Sacred Heart and Parents, this Court should preliminarily enjoin the Act.

## ARGUMENT

### I. Sacred Heart and Parents have standing to challenge Michigan's laws.

Article III authorizes federal courts to address "those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (cleaned up). "Those disputes" include situations where a prospective plaintiff can show, among other things, an injury-in-fact that is "concrete[,] particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 158 (cleaned up).

When bringing a pre-enforcement First Amendment challenge, a plaintiff can show "two types of injuries." *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003). First, a plaintiff can allege an intent to engage in constitutionally protected activities in a way that would arguably violate the law, and that such activities would give rise to a credible fear of the state's enforcement. *SBA List*, 573 U.S. at 159. Alternatively, a plaintiff can allege that the law has chilled his constitutionally protected speech, and that such chilling is objectively reasonable in light of the surrounding circumstances. *Ward*, 321 F.3d at 1267. To have a concrete injury, a plaintiff need *not* suffer an "actual arrest, prosecution or other enforcement action." *SBA List*, 573 U.S. at 158. Sacred Heart has satisfactorily alleged both theories here.

Parents also suffer harm because the Act threatens Sacred Heart's existence. Parents have a "fundamental right to … direct[ ] their children's education." *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004). For all the reasons that the Act will harm Sacred Heart's ability to faithfully cultivate a Catholic community, so too does it harm Parents' right to educate their children in an intentionally Catholic setting. Parents' standing analysis functionally mirrors Sacred Heart's.

### A. Sacred Heart wants to exercise its First Amendment rights in ways the Act arguably prohibits.

Michigan's laws at least arguably prohibit Sacred Heart from exercising protected First Amendment activities. *SBA List*, 576 U.S. at 157. "Arguably" sets the bar low; Sacred Heart need only offer a "*plausible* interpretation of the statute[s]." *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022). For standing, that interpretation need not be the best or even the only reading—just one that is "reasonable enough." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022). And that's especially true where, as here, a plaintiff "need[ ] only to plausibly allege standing's elements at the pleading stage." *Davis v. Colerain Twp.*, 51 F.4th 164, 171 (6th Cir. 2022); *accord Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) ("[T]he law is aimed directly at plaintiffs, who, *if their interpretation of the statute is correct*, will have to take significant and costly compliance measures or risk criminal prosecu-

tion." (emphasis added)). With each provision, Sacred Heart has easily cleared the mark.

### 1.    The Employment Provision violates Sacred Heart's religious autonomy and free association rights.

As a religious school, Sacred Heart has the right to "to decide for [itself], free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady of Guadalupe*, 140 S. Ct. at 2055 (cleaned up). Given the First Amendment's robust protection of religious groups' internal autonomy, "the Religion Clauses foreclose certain employment discrimination claims" that intrude on those groups' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id.* at 2061. They protect "the freedom of religious groups to select their own" representatives and reject those who go against the tenets of the faith. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 184 (2012).

The Religion Clauses' protections are complimented by the First Amendment's free-association protections. "[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of … educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up). To force a "group to accept

members it does not desire" burdens that group's associational rights by intruding on its "internal structure or affairs," impairing its ability to express certain views—"and only those views." *Id.* at 648. Moreover, it "significantly burden[s] the organization's right to oppose or disfavor [certain] conduct." *Id.* at 659.

Though "religious and secular groups alike" enjoy free-associational rights, the First Amendment gives "special solicitude to the rights of religious organizations." *Hosanna-Tabor*, 565 U.S. at 189. Their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Id.* at 200 (Alito, J., concurring). "[T]o advance religion … is their very purpose." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 337 (1987). That's especially true of Catholic schools like Sacred Heart that exist to help parents educate their children holistically in the Church's teachings. "The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine … [has been] unquestioned." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728–29 (1871).

That includes religious groups' right to decide that only those people who share the groups' beliefs should help to "define and carry out their religious missions." *Amos*, 483 U.S. at 335. Courts must "stay out of employment disputes involving those holding certain important positions"—including teachers—"with[in] churches and other religious

24

institutions." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. But even beyond ministers, religious groups have a "constitutionally protected interest … in making religiously-motivated employment decisions," such that courts cannot "dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices." *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 623, 626–27 (6th Cir. 2000).

This "membership" principle is not limited to hiring someone of a particular religion or denomination. *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139–40 (1872). It gives religious groups the autonomy to "shape [their] own faith and mission through [their] appointments," ensuring that all personnel will contribute to, not detract from, the group's shared ideals. *Hosanna-Tabor*, 565 U.S. at 188. Indeed, "courts of appeals have generally protected the autonomy of religious organization[s] to hire personnel who share their beliefs." *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1094 (2022) (Alito, J., respecting the denial of certiorari) (collecting cases).

Yet the Employment Provision makes it illegal for Sacred Heart to hire and retain only faculty and staff who support, live, and model the Catholic faith and its doctrines. The Provision *prohibits* recruiting employees "because of" religion, MCL 37.2202(1), declining to hire employees "because of" religion, sex, sexual orientation, and gender identity or expression, *id.*, or using a pattern or practice of such

recruitment and hiring, MCL 37.2206(2); MCL 37.2605(1). That means Sacred Heart cannot hire only those employees who agree with Catholic teaching on marriage, sexuality, and gender identity. Instead, Sacred Heart will be compelled to hire and retain those who advocate a vision of human flourishing that is antithetical to Church doctrine. And there is "no clearer example of an intrusion" on a religious organization's associational rights than forcing it to accept those who do not share its faith, since that "would cause the group as it currently identifies itself to cease to exist." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861, 863 (7th Cir. 2006).

Sacred Heart cannot create an authentic Catholic community that models the faith to children without autonomy to make personnel decisions. To fulfill its mission, Sacred Heart must hire only those who support the Church's doctrines and agree to affirm and abide by its teachings. "[E]mployees play a crucial role in preserving and transmitting—or undermining—institutional ideas and norms." Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe School: *Too Broad? Or Broad As It Needs to Be?*, 25 Tex. Rev. L. & Pol. 319, 354 (2021). Sacred Heart depends on and expects its employees to communicate, through word and deed, the faith to the children entrusted to Sacred Heart's care. But for the Employment Provision, Sacred Heart would hire and retain accordingly. Yet the Provision

26

arguably prevents Sacred Heart from taking the steps it needs to secure its religious identity.

> ### 2. The Education Provision prevents Sacred Heart from fully transmitting the Catholic faith to its students.

Sacred Heart has the same religious-autonomy and free-association rights to shape its student body. In cultivating an intentionally Catholic community, students must agree to abide by and model Catholic doctrine. Compl., R.1, PageID#6. Sacred Heart's student handbook outlines these expectations and the consequences for students who violate them. *E.g.*, Compl. Ex. 1, R.1-2, PageID#94.

The Education Provision now forbids this practice. The Provision prohibits discrimination based on sexual orientation and gender identity in student admission, retention, and discipline. MCL 37.2402(b). That means Sacred Heart can't secure student agreement to abide by the Church's teachings on sexual orientation and gender identity. MCL 37.2402(c). Nor can the school take disciplinary action against students who violate the Church's doctrine on these matters. Deprived of these rights, Sacred Heart cannot cultivate the Catholic community that it desires, nor transmit the faith and shape the next generation in Catholicity.

Consider how many policies the Education Provision would upend. Sacred Heart requires student to wear sex-specific uniforms, use sex-

specific restrooms, and play on sports teams consistent with students' sex. Compl., R.1, PageID#15, 42. Michigan considers each of these policies discriminatory. Br. of Cal. et al. as Amici Curiae in Supp. of Neither Party, *Tennessee v. Dep't of Educ.*, No. 22-5807 (6th Cir. Dec. 22, 2022), 2022 WL 18027407, at *10–11. So if Sacred Heart disciplined a student for violating these policies, Sacred Heart would itself violate the Education Provision. The Provision requires Sacred Heart to either lie to students about its views on sex and gender identity—which would sabotage the school's Catholic mission and identity—or act in accordance with Church doctrine and face the State's wrath, risking six-figure damages, attorney fees, and civil fines up to $50,000. MCL 37.2607(2).

Religious schools like Sacred Heart exist to transmit the faith. *Our Lady of Guadalupe*, 140 S. Ct. at 2055. Indeed, Sacred Heart would shut down before compromising the Catholic faith or teaching anything inconsistent with the Church's doctrine. Though the First Amendment should protect Sacred Heart from facing such a choice, the Education Provision now puts Sacred Heart between a rock and a hard place. Sacred Heart has plausibly alleged that the Provision arguably prohibits the school's constitutionally protected activities.

### 3. Michigan's Accommodation Provision compels Sacred Heart's speech and violates its sincere religious convictions.

Michigan's Accommodations Provision requires a public accommodation to provide "equal enjoyment" and "equal utilization" of its goods, services, and privileges. MCL 37.2302(a); MCL 37.2102(1). The Provision also bars accommodations from using any "pattern or practice" that differentiates based on protected characteristics. MCL 37.2605. These prohibitions apply not just as to "members of the public" but to "any individual," including employees. *Haynes v. Neshewat*, 729 N.W.2d 488, 490 (Mich. 2007).

Unlike public schools, Sacred Heart does more than teach academic subjects; it forms students in the Catholic faith and helps them understand their identity as beloved sons and daughters of God. Compl., R.1, PageID#11, 14, 42. To accomplish this mission, Sacred Heart retains only those faculty and staff who model authentic Christian masculinity and femininity. And it employs policies that promote what Catholic doctrine teaches as Truth—namely, the Lord God made two sexes, and a person cannot "transition" to "a gender inconsistent with his or her biological sex." *Id.*, PageID#12.

That means Sacred Heart refers to all students and employees using sex-reflexive pronouns; it will not use a person's self-selected pronouns. Pronouns speak a powerful message to students about their intrinsic identity as male or female, and Sacred Heart believes, in

accordance with Catholic doctrine, that "a person's sexual identity is determined at conception," with "each of the two sexes … an image of the power and tenderness of God." *Id.*, PageID#12. To refer to anyone using a pronoun based on gender identity would, in Sacred Heart's view, deviate from the Truth and human flourishing.

The Accommodation Provision now forbids this practice. Michigan interprets the Provision to require the same service to all regardless of gender identity. *Clarke v. K Mart Corp.*, 495 N.W.2d 820, 822 (Mich. Ct. App. 1992) (per curiam); *cf. Telescope Media Grp. v. Lucero*, 936 F.3d 740, 748–49, 750 n.2 (8th Cir. 2019). To Michigan, that means that an accommodation must use a person's personally selected pronouns for that person to receive the same service. Michigan has been clear that "pronoun misuse" and "repeatedly using the wrong name and pronouns"—as the *State* defines wrong—constitutes discrimination. Br. of Cal. et. Al as Amici Curiae in Supp. of Neither Party, *Tennessee v. Dep't of Educ.*, No. 22-5807 (6th Cir. Dec. 22, 2022), 2022 WL 18027407, at *2, *12. Indeed, when Michigan's judiciary adopted a pronoun policy, one Michigan Supreme Court justice explained that using "personally specified pronouns" "aligns with" the Act's prohibition on sexual-orientation and gender-identity discrimination. Order, Amend. of MCR 1.109, Mich. Sup. Ct. (Sept. 27, 2023), https://perma.cc/LPX3-5PGZ.

The law makes Sacred Heart's beliefs illegal even if Sacred Heart never uses divergent pronouns. The Act prohibits any "policy or prac-

tice" that promotes unequal treatment. So the Accommodation Provision punishes even Sacred Heart's *policy* about pronoun usage that differs from the State's orthodoxy.

To avoid running afoul of the Accommodation Provision, Sacred Heart would be compelled to speak in a way that violates its religious convictions. The Accommodation Provision therefore arguably proscribes Sacred Heart's constitutionally protected activities.

### 4. The Act contains multiple Publication Bans that chill and censor Sacred Heart's speech.

The Act's three provisions each contain an accompanying Publication Ban that prohibits covered entities from communicating any message contrary to the Act's values. MCL 37.2402(d), 37.2206, 37.2302(b). (The Equal Accommodations Act also contains a Publication Ban. MCL 750.147. Sacred Heart's arguments against the ELCRA's Publication Bans apply equally to the EAA's.) These Publication Bans prevent Sacred Heart from communicating its views on sexuality and gender identity, chilling Sacred Heart's speech and infringing its religious exercise.

For example, Sacred Heart's pastor wants to post a statement on the school's website reaffirming Sacred Heart's commitment to Catholic doctrine on marriage and sexuality. Statement on Catholic Doctrine, R.1-8, PageID#135–37. Moreover, Sacred Heart aims to hire several employees, including an art teacher and a coach, and wants to advertise

these positions on its website and others. As part of the advertisement, Sacred Heart would explain the school's requirement that employees live out Catholic teaching sexuality and gender identity.

These posts would all expose Sacred Heart to liability. The pastor's post would reflect a "policy or practice" that violates the Accommodation Provision. And the employment advertisement would violate the Employment Provision. The Publication Bans therefore censor Sacred Heart from expressing its values and expectations.

### B.   Sacred Heart has refrained from speaking lest Michigan enforce its laws.

In addition to alleging constitutionally protected activities that Sacred Heart would engage in but for the Act's prohibitions, Sacred Heart has demonstrated how the Act has currently chilled its speech.

As reviewed, Sacred Heart's pastor wants to post a statement on the school's website reaffirming the school's commitment to Catholic doctrine on marriage and sexuality. Statement on Catholic Doctrine, R.1-8, PageID#135–37. And the school wants to advertise for two open positions, using advertisements that would, like all Sacred Heart positions, explain the school's expectation that prospective employees live out Catholic doctrine in their own lives. But because the Publication Bans prevent Sacred Heart from posting these things, the school has chilled its speech. *See supra* Argument § I.A.4. This "chilling effect" "constitutes a present injury in fact" for Sacred Heart. *G & V*

*Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994).

### C. The "surrounding circumstances" demonstrate that Sacred Heart has a credible fear that Michigan will enforce its laws.

Both theories of pre-enforcement standing require a plaintiff to show a credible threat of enforcement. The analysis looks the same for either theory. *Colo. Union of Taxpayers, Inc. v. Griswold*, No. 22-1122, 2023 WL 5426581, at *3 n.4 (10th Cir. Aug. 23, 2023).

Sacred Heart has shown that Michigan will likely enforce its laws against the school. This "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1133. In fact, several circuits credit plaintiffs with a "presumption of enforcement" for non-moribund laws. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336 (5th Cir. 2020); *accord United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 901 (10th Cir. 2016). Sacred Heart merely needs to demonstrate "an objectively justified fear of real consequences." *Peck*, 43 F.4th at 1132 (cleaned up). Because the "surrounding factual circumstances show that a fear of prosecution is plausible," Sacred Heart has standing. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022).

"To identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech." *Fischer*

33

*v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam). The Act does just that. *Supra* Argument §§ I.A.4, I.B.

Rather than treat this chilling effect as "the first and most important factor," *Fischer*, 52 F.4th at 307, the district court dismissed it as "insufficient," Order, R.44, PageID#952. Instead, the court turned to the so-called "*McKay* factors" as dispositive. *Id.*, PageID#953. In *McKay*, this Court observed that it has "found a credible threat of prosecution where plaintiffs allege a subjective chill and point to some combination" of factors. 823 F.3d at 869.

This Court never intended the *McKay* factors to function as a rigid test that controls every pre-enforcement inquiry. *McKay* merely sets forth what historically had been *sufficient* to show standing, not what was *necessary* in all cases. Subsequent cases prove that point. This Court has more recently described the so-called *McKay* factors as neither "exhaustive," *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021), nor a "laundry list," *Fischer*, 52 F.4th at 307. It was error for the district court to treat them as such. But even applying the "commonly recurring factors" listed in *McKay*, Sacred Heart has shown a sufficient "combination" to establish a credible threat of enforcement. *Fischer*, 54 F.4th at 307.

### 1.    Michigan vigorously enforces its laws.

Michigan actively enforces its laws. It has investigated almost 10,000 complaints against employers and public accommodations between 2011 and 2022. Compl., R.1, PageID#46. From May 2018 to December 2019 alone, Michigan investigated 73 complaints alleging sexual orientation and gender identity discrimination. *Id.*, PageID#46. And after the Michigan Supreme Court interpreted the word "sex" to encompass sexual orientation, the State investigated *900* sex-discrimination complaints. MCRC Annual Report 30.

Some of these investigations have been directed at religious organizations. The State has investigated: (1) a wedding venue that for religious reasons declined to host a same-sex wedding; (2) an electrolysis who for religious reasons declined to remove hair from a male who identifies as a female; (3) a hairstylist who merely *commented* on gender identity in a social media post; and (4) Catholic Charities that feed the hungry and house the homeless. Michigan also received a complaint against a Catholic health care clinic.

So zealously does Michigan enforce its Act against religious organizations that courts perceive "religious targeting." *Buck*, 429 F. Supp. 3d at 462–63. The legislature rejected numerous attempts to add religious exemptions to its Act, even though other states overwhelmingly include them. And Attorney General Nessel has vowed "to ensure no person in this state *ever* experiences barriers to

employment, housing, education, or public accommodations and services because of who they are or whom they love." Compl., R.1, PageID#48 (emphasis added). She has consistently committed the State to litigation positions that would deny religious exemptions against discrimination laws. Statement of the Case § III.B. And she has repeatedly "made public comments hostile to the Catholic faith" and its teaching, leading one Michigan news outlet to label her campaign as a "crusade" against Catholicism. Compl., R.1, PageID#47–48. Her "significant posturing … in public comments" supports standing. *Online Merchs. Guild*, 995 F.3d at 550–51.

The district court dismissed this history because it did not involve "a church or a religious school." Order, R.44, PageID#954. But Catholic Charities *is* affiliated with the Catholic Church. And such a tight restriction does not come from this Court's precedents. In fact, this Court has allowed pre-enforcement challenges in cases with *no* enforcement history against *anyone. Nabors*, 35 F.4th at 1035. If a plaintiff has standing when there's no enforcement history, then Sacred Heart has standing here where there's copious enforcement history, just not against "church[es]" or "religious school[s]." *See Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 140 (2d Cir. 2023) (per curiam) ("[T]he Supreme Court and at least four other circuits have sustained pre-enforcement standing without a past enforcement action or an overt threat of prosecution directed at the plaintiff.").

36

Rather than require an exact match, this Court allows challenges when a plaintiff demonstrates a general enforcement history. In *Schlissel*, for instance, this Court held that a student group had standing to challenge a university policy that chilled their speech because they highlighted "sixteen disciplinary cases" under the policy. 939 F.3d at 766. This Court rejected the university's argument that the students lacked standing because the policy had never been enforced against the specific "intellectual debate" that the students wanted to engage in. *Id.* Of the 16 disciplinary cases, *none* involved protected speech. Yet they were enough to show a history of enforcement.

Just this year, this Court held that a wine merchant could challenge an Ohio law that limited wine transportation, even though the law had been enforced only against beer or liquor transportation. *Block v. Canepa*, 74 F.4th 400, 404–05 (6th Cir. 2023). Calling the exact comparator analysis "flawed," this Court held that the merchant had standing merely by showing that "Ohio *does prosecute* violations" of its law generally—even if not against wine transportation specifically. *Id.* at 410.

The district court wrongly dismissed *Block* as "not a good fit." Order, R.44, PageID#956. The court thought that *Block* involved "the very conduct in which [the plaintiff] wished to engage," but somehow concluded that Michigan's enforcement does *not* involve the activity that Sacred Heart wishes to engage in. *Id.*, PageID#956.  That's wrong

37

legally—it merely "fine-tun[es] the level of generality" to require a "specific level of" comparators in this case while ignoring the "higher level of" comparators this Court looked at in *Block*. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1739 (2018) (Gorsuch, J., concurring). It's also wrong factually: under Michigan's interpretation of its laws—an interpretation it has enforced—Sacred Heart's activities qualify as "sex" or "religious" discrimination. That's the "very conduct" at issue in this case.

In any event, complainants have tried to enforce the Act against religious schools. *E.g.*, *Weishuhn v. Lansing Cath. Diocese*, 787 N.W.2d 513, 518 (Mich. Ct. App. 2010); *Porth v. Roman Cath. Diocese of Kalamazoo*, 532 N.W.2d 195, 197–98 (Mich. Ct. App. 1995); *McLeod v. Providence Christian Sch.*, 408 N.W.2d 146, 150 (Mich. Ct. App. 1987). The district court thought this history cut against Sacred Heart because the Michigan courts found the schools qualified for First Amendment protections. That conclusion is factually wrong, *e.g.*, *McLeod*, 408 N.W.2d at 153 ("[W]e are not satisfied that the burden placed on the defendant by the act is so great that it outweighs the state's interest in eliminating sex discrimination to which the act is addressed."), and it also confused standing with the merits. It requires Sacred Heart to risk prosecution and hope a Michigan court would eventually find in its favor. That's the scenario pre-enforcement challenges are meant to

avoid. That complainants have targeted religious schools under the Act demonstrates that Sacred Heart has a credible fear of enforcement.

### 2. Michigan's laws are easy to enforce and can be done so by someone outside the State apparatus.

Sacred Heart's credible enforcement fear is "bolstered" by the fact that the Act is easy to enforce. *SBA List*, 573 U.S. at 164; *McKay*, 823 F.3d at 869. Any "aggrieved" person—from individuals to advocacy groups—can file a complaint. Compl., R.1, PageID#44 (quoting MDCR Rule 37.4(1)). To be "aggrieved," a person need not have been denied service but can merely point out the existence of an offensive policy or practice. *Id.*, PageID#45 (quoting MCL 37.2605(1)). Michigan facilitates complaints by allowing "aggrieved" persons to file them online. *See* Mich. Dep't of C.R., Compl. Request, https://perma.cc/7FF5-7VN3 (last visited Nov. 5, 2023).

One complaint triggers a burdensome investigation. Those charged must file responses under oath, produce documents, and give testimony. MCL 37.2602(d); MDCR 37.11(1). If a person charged declines to comply, he risks court-ordered compulsion or even default judgment. MDCR 37.4(10), 37.14(1), 37.11(6). After investigation, Michigan can impose significant penalties: six-figure damages, attorney fees, and civil fines up to $50,000. MCL 37.2605(1)–(2).

Moreover, unique enforcement mechanisms against public accommodations heighten Sacred Heart's fears. Any person can sue

Sacred Heart under the Equal Accommodations Act and potentially recover "treble damages." MCL 750.147. "As the definition of 'public accommodation' has expanded"—and the culture has grown increasingly hostile to religious views like those of Sacred Heart—"the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased." *Dale*, 530 U.S. at 657. Recent cases bear out how public accommodations laws have been weaponized against those with divergent views on sexuality and gender identity. *E.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (applying a public accommodations law against a website designer); *Masterpiece Cakeshop*, 138 S. Ct. at 1725 (same against a baker); *see also* Br. of Mass. et al. as Amici Curiae in Supp. of Resp'ts, *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Aug. 19, 2022) (Michigan taking the position that a state can use its public accommodations to force a website designer to speak the state's messages about marriage).

Sacred Heart also could face criminal prosecution. Attorney General Nessel can use the Accommodation Provision's Publication Ban to bring misdemeanor charges against Sacred Heart for each violation. A guilty verdict could subject Sacred Heart to fines and possible jailtime. MCL 750.147.

All these "attribute[s]" that make "enforcement easier or more likely" further demonstrate Sacred Heart's credible fears. *McKay*, 823 F.3d at 869.

### 3.   Michigan refuses to disavow enforcement against Sacred Heart.

Michigan never disavows enforcing its Act against Sacred Heart. Instead, the State says that disavowal here would be "impossible … where the religious freedom inquiry would be so fact dependent." Reply Br. in Supp. of Mot. to Dismiss, R.32, PageID#775. When states refuse to disavow enforcement, "courts do not closely scrutinize the plaintiff's complaint for standing." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 451 (6th Cir. 2014). Instead, they "often determine there *is* a credible threat of prosecution." *Greenberg v. Lehocky*, 81 F.4th 376, 386 (3d Cir. 2023) (emphasis added). Michigan's refusal to disavow enforcement buttresses Sacred Heart's credible fears.

Somehow the district court thought that Michigan's equivocation cut against Sacred Heart. In doing so, the court ignored the basic principles undergirding pre-enforcement challenges. Pre-enforcement challenges exist so that plaintiffs can *avoid* prosecution. So a state's equivocation supports, not lessens, a plaintiff's fears that his activities may run afoul of the state's enforcement authority. *E.g., Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 376 (5th Cir. 2022); *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1306 (11th Cir. 2017). That's true even when the plaintiff brings an as-applied challenge that involves "general claims." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 n.7 (2010). Absent disavowal, plaintiffs lack a guarantee that

41

"the [State] might not tomorrow" prosecute them simply for exercising their constitutional rights. *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999).

The district court's logic would allow a state to defeat pre-enforcement standing in almost every case. A state can always argue that a law's enforcement "depends" on a particular factual situation. That should not allow the state to sidestep a pre-enforcement challenge. Especially in cases like this one, where Sacred Heart has in its complaint provided explicit examples of what it wants to say and what activities it wants to engage in, states should either disavow enforcement or litigate the merits, not play coy with standing.

Indeed, Michigan admitted that its law facially covers Sacred Heart, Br. in Supp. of Mot. to Dismiss, R.23, PageID#384, and the district court accepted this view, Order, R.44, PageID#946 (noting that the Act regulates Sacred Heart as "an employer," "an educational institution," and "potentially a place of public accommodation" (cleaned up)). When plaintiffs "belong[ ] to a class that is facially restricted by" a law, courts "assume a credible prosecutorial threat." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218 (5th Cir. 2023). That makes sense. Because of Sacred Heart's facial coverage, "nothing binds the Commission[ ] here—[it] could change [its] mind and decide [Sacred Heart's activities] do violate the statute." *Id.* Michigan's concession that its laws facially cover Sacred Heart while insisting that the school's

activities are not "arguably prohibited" is a pie-crust promise at best. It does not defeat standing.

**D. The district court inappropriately invoked hypothetical exemptions to reject Sacred Heart's standing.**

Michigan's laws proscribe Sacred Heart's constitutionally protected speech and religious exercise in numerous ways. Yet the district court invoked two features of these laws to hold that Sacred Heart did not having standing. First, the court thought that a provision within the laws stating that some discrimination is "permitted by law" meant that enforcement authorities would *always* interpret the Act consistent with the First Amendment. And second, the court suggested that Sacred Heart might qualify for the Act's BFOQ exemption, placing Sacred Heart's religious autonomy beyond the Act's reach (although still within the government's hands). Neither argument is correct.

**1. Savings clauses like those in Michigan's laws cannot defeat standing *ex ante*.**

Michigan's laws do not apply where the activity is "permitted by law." MCL 37.2302; MCL 750.146; *see also* MCL 37.2705(1). This clause, the district court suggested, requires Michigan to interpret its laws consistent with the First Amendment. And because Sacred Heart's activities are presumably protected by the First Amendment, the court reasoned that Sacred Heart lacked standing to challenge the laws' application to its protected activities.

43

Again, the district court's view would always defeat pre-enforcement standing. *Every* statute must conform to the Constitution. U.S. Const. art. VI, para. 2. Government officials could always promise to interpret laws consistent with the Constitution and, per the court's reasoning, place those laws beyond pre-enforcement challenge.

But the Supreme Court has never shut the courthouse doors on a plaintiff in the face of a government promise to color within the constitutional lines. Consider *SBA List*. There, the statute prohibited "certain 'false statements' during the course of any campaign." 573 U.S. at 151–52. SBA List brought a pre-enforcement action because it feared that the state would prosecute it for statements it wanted to make about a congressman's abortion stance. *Id.* at 153–54. This Court initially "contend[ed] that SBA's fears of enforcement are misplaced because SBA has not said it plans to lie or recklessly disregard the veracity of its speech." *Id.* at 163 (cleaned up). But that reasoning "miss[ed] the point." *Id.* Though the statute prohibited only false speech, that did not stop the state from "finding probable cause to believe that SBA had violated the law." *Id.* SBA therefore pled a credible threat that the state would enforce the law against them.

This Court has likewise rejected attempts to defeat standing through governments' promises to behave. In *Dambrot v. Central Michigan University*, a university argued that its anti-harassment policy did not implicate the plaintiff's First Amendment concerns

44

because the school promised "not … [to] interfere impermissibly with individuals' rights to free speech." 55 F.3d 1177, 1183 (6th Cir. 1995). This Court held that the university's assurances did "nothing to ensure the University will not violate First Amendment rights even if that is not their intention." *Id.* The policy applied to a broad range of speech, and that speech could "be prohibited upon the initiative of the university." *Id.* That gave the plaintiff standing. So too here.

The district court's logic would eviscerate pre-enforcement challenges. Sacred Heart brought this challenge to ensure the First Amendment *does* protect its activities. But Michigan dodged review by simply saying that the First Amendment *might* apply—without ever committing to an affirmative stance one way or the other. Sacred Heart has no idea if its speech is exempt unless it speaks now and invites prosecution. Pre-enforcement challenges are supposed to avoid that Hobson's choice.

At bottom, the district court's contention that the savings clause defeats standing is just a merits argument in disguise. "For standing purposes," this Court must accept "as valid the merits of [Sacred Heart's] legal claims," so it must assume that Michigan will apply its laws in a way contrary to the Constitution. *FEC v. Cruz*, 596 U.S. 289, 298 (2022). Aside from sticking its neck out by acting first and hoping Michigan does not bring down the axe—something the Supreme Court has explicitly rejected, *Babbitt v. United Farm Workers Nat'l Union*, 442

U.S. 289, 298 (1979)—Sacred Heart has no other way to exercise its constitutional rights safely. It need not "subject itself to the very framework it says unconstitutionally burdens its" rights to have standing. *Cruz*, 596 U.S. at 298.

Moreover, the district court never held that Sacred Heart's activities actually fall within the First Amendment's protections. So Sacred Heart can take little comfort even from the district court's own conclusions.

Here, the statutes may say that they must be construed with other laws, but that does not mean that an enforcement authority (or a reviewing court) will treat them that way. As our Founders recognized, we are governed not by angels but by fallible men. The Federalist No. 51 (J. Madison). The district court's reasoning assumes too much.

### 2. The scant possibility that Michigan could grant Sacred Heart a BFOQ does not defeat standing.

The district court also thought that the possibility that Michigan could grant Sacred Heart a BFOQ for its constitutional activities defeated standing. That's incorrect from the start. Michigan can only grant a BFOQ as to the Employment Provision; no equivalent exemption exists for the Education, Accommodation, or Publication Provisions. So a BFOQ is irrelevant to most of Sacred Heart's challenges. But the district court is also wrong. The possibility of a BFOQ *compounds*, not ameliorates, Sacred Heart's injuries.

The First Amendment guarantees religious organizations a "sphere" of "independence" and "autonomy" to make "internal management decisions." *Our Lady of Guadalupe*, 140 S. Ct. at 2060; Argument § I.A.1. These decisions belong to Sacred Heart "alone"—it does not share them with government bureaucrats. *Hosanna-Tabor*, 565 U.S. at 194–95.

Yet that's precisely what the district court would have Sacred Heart do. To obtain a BFOQ, Sacred Heart must hire an attorney, respond to questions for each of its positions, justify why filling those positions with someone who shares the ministry's faith is "necessary," discuss "compelling reason(s) why" non-religious persons "could not reasonably perform the duties of the position," and submit a legal brief. Then, Michigan, in an inversion of First Amendment principles, would have the exclusive discretion to grant or deny the request. MCL 37.2208. All the while, Sacred Heart would remain open to possible liability. Michigan would evaluate Sacred Heart's "normal operation" and decide whether the BFOQ is "reasonably necessary" to further the school's mission. *Id.* It could request "all" Sacred Heart's "records, documents, data, or other information" as the State sees fit. MDCR 37.25. And it could grant the exemption only to revoke it within 21 days. *Id.* Even if the State doesn't revoke, Sacred Heart would need to reapply every five years. *Id.*

Constitutional rights do not exist "at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). The Constitution's enumerated provisions "protect[ ] *against* the government." *Id.* (emphasis added). To force Sacred Heart to request permission from the government to exercise its constitutional rights turns those cherished promises into a dead letter.

It would also burden Sacred Heart's religious exercise. The BFOQ process empowers government officials to "troll[ ] through the [school's] beliefs …, making determinations about its religious mission and whether certain [employees] contribute to that mission." *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 835 (D.C. Cir. 2020). It would also require Sacred Heart to jump over countless hurdles simply to exercise its religious freedom. Both problems undermine the First Amendment.

The BFOQ process also opens up another constitutional can of worms. If Sacred Heart applies for a BFOQ, Michigan bureaucrats are empowered to decide, on a case-by-case basis, which positions qualify. That's exactly the system of "individualized exemptions" that the Supreme Court has said violates the Free Exercise Clause. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

Sacred Heart need not violate its own constitutional rights to have standing to vindicate them. As this Court has held, plaintiffs "do[ ] not need to proceed through [an] allegedly invalid process to challenge [a]

48

policy in court"—they can "challenge a religiously discriminatory policy without receiving a formal denial." *Doster v. Kendall*, 54 F.4th 398, 416–17 (6th Cir. 2022).

The record demonstrates that it would also be futile for Sacred Heart to apply for a BFOQ. In the rare event when Michigan has granted a BFOQ, it has not done so for positions like "support staff, clerical or maintenance personnel[,]" "janitorial staff, physical education teacher[s, or] office personnel." App. in Supp. of Pls.' Opp'n to Mot. to Dismiss, R.29-4, PageID#721–22. Sacred Heart's mission depends on *all* employees affirming its religious values. There's nothing to suggest Michigan would allow that to happen.

The district court's invocation of a possible BFOQ to defeat Sacred Heart's standing puts the school's "First Amendment rights … at the sufferance of the" State; the school has "no guarantee that the [State] might not tomorrow" deny an exemption and apply the Act against Sacred Heart full force. *N.C. Right to Life*, 168 F.3d at 711. The mere possibility that Sacred Heart *might* obtain a BFOQ for *some* of its activities does not defeat standing.

## II.   Sacred Heart is entitled to a preliminary injunction because it is likely to succeed on the merits.

Sacred Heart is also likely to succeed on the merits of its challenge. In myriad ways, Michigan's laws infringe on Sacred Heart's protected constitutional activities. Because "injustice might otherwise

49

result," this Court should reverse and remand with instructions to enter the requested preliminary injunction. *Hormel v. Helvering*, 312 U.S. 552, 557 (1941).

Michigan never disputed the merits of Sacred Heart's claims below and has therefore forfeited challenging them on appeal. *Fischer v. Thomas*, 78 F.4th 864, 869 (6th Cir. 2023); *see also* Pls.' Br. in Opp'n to Mot. to Dismiss, R.29, PageID#552. Accordingly, Sacred Heart and Parents are entitled to a preliminary injunction. What's more, the reasons why Sacred Heart has standing equally attest to the likelihood that it will succeed on the merits.

### A.    The Act violates Sacred Heart's free speech rights.

#### 1.    The Accommodation Provision impermissibly compels Sacred Heart's speech.

Governments "may not compel a person to speak [the state's] own preferred messages." *303 Creative*, 600 U.S. at 586. That's especially true for "sensitive political topics" like gender identity and pronoun usage. *Janus v. Am. Fed. of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018). As this Court recently held, pronouns "convey a powerful message implicating a sensitive topic of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021).

Sacred Heart believes that "God created man in His own image … male and female he created them." Compl., R.1, PageID#11. The school uses language that intentionally reflects its "conviction that one's sex

cannot be changed." *Meriwether*, 992 F.3d at 508. To use pronouns inconsistent with sex is to violate the belief that "proper love of God and neighbor must be rooted in truth." Compl., R.1, PageID#11.

By forcing Sacred Heart to use students' self-selected pronouns, the Accommodation Provision compels the school's speech. *303 Creative*, 600 U.S. at 586. This case aligns with *Meriwether*. There, a university required professors to address students using students' self-selected pronouns. *Meriwether*, 992 F.3d at 498. One professor objected to this policy based on his religious "conviction that one's sex cannot be changed." *Id.* at 508. The university punished him. *Id.* at 502. This Court held that the university's punishment compelled the professor to speak a message that he opposed—in violation of the First Amendment.

The same is true here. Michigan cannot use the Accommodation Provision to compel Sacred Heart to speak. Sacred Heart is likely to succeed on its compelled-speech challenge.

### 2.    The Publication Bans censor Sacred Heart's speech based on content and viewpoint.

A law regulates speech based on content when it "target[s] speech based on its communicative content." *KenAmerican Res., Inc. v. U.S. Sec'y of Labor*, 33 F.4th 884, 893 (6th Cir. 2022). If a law goes further and suppresses speech based "not [only on] subject matter, but [also on] particular views taken by speakers on a subject," that law discriminates based on viewpoint, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515

U.S. 819, 829 (1995), a particularly "egregious form of content discrimination," *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (cleaned up).

Laws that censor based on content and viewpoint are "presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and so "blatant[ly]" violate the First Amendment that they rarely survive review, *Rosenberger*, 515 U.S. at 829. Viewpoint-discriminatory laws might even be "unconstitutional per se." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 n.12 (11th Cir. 2020) (citing *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804–05 (1984)).

Michigan's Publication Bans are all content- and viewpoint-based. A simple test to determine whether a speech restriction is content-based is to ask whether the law "require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (cleaned up). Here, to enforce its Bans, Michigan must examine what Sacred Heart says. The Bans are implicated only if the school discusses certain content—namely, sexual orientation, gender identity, or other protected characteristics. Each Ban is triggered based on "the topic discussed," *Reed*, 576 U.S. at 163, and enforcement authorities must examine the content of a counselor's speech "to determine whether a violation has occurred," *McCullen*, 573 U.S. at 479

(cleaned up). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020).

A law goes further and suppresses speech based on viewpoint when it targets "the specific motivating ideology or the opinion or perspective of the speaker." *Reed*, 576 U.S. at 168–69 (cleaned up). Michigan's Bans do that, too. If Sacred Heart openly celebrates all marriages in its employment advertisements, it does not run afoul of the Bans. But if it discusses that marriage is a permanent union reserved for one man and one woman, then Michigan law treats that expression as impermissibly discriminatory. The Bans target only one viewpoint.

## B.   The Act violates Sacred Heart's free-exercise rights and religious autonomy.

### 1.   The Act forces Sacred Heart to hire employees and retain students contrary to the Catholic faith.

As reviewed, the First Amendment robustly protects religious organizations' internal autonomy and puts "areas of conduct … beyond the power of the State to control." *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972); Argument § I.A.1. Religiously motivated employment decisions are "*per se* a religious matter," and courts have no say when it comes to "how and by whom churches spread their message." *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 804–05 (4th Cir. 2000) (cleaned up). Though religious groups do not have a "general immunity from

secular laws," *Our Lady of Guadalupe*, 140 S. Ct. at 2060, they do get to make decisions that "at times result from preferences wholly impermissible in the secular sphere," *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1170–71 (4th Cir. 1985). And "[w]here the values of state and church clash" over "decision[s] of a theological nature, the church is entitled to pursue its own path without concession to the views of" the government. *Id.* at 1171. Civil authorities cannot second-guess religiously motivated decisions and say that the group's "beliefs are flawed." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014).

From property disputes, *Watson*, 80 U.S. at 679, to internal procedures, *Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 721 (1976), to ministerial employment, *Hosanna-Tabor*, 565 U.S. at 188–89, courts have protected religious groups' autonomy to manage their internal governance. The Supreme Court has also recognized the religious education and formation of children as beyond the State's grasp. *Yoder*, 406 U.S. at 233–34.

Michigan's Act improperly intrudes in these spheres. The Act makes it illegal for Sacred Heart to hire only those who will support, live, and model the Catholic faith. Likewise, the Act makes it illegal for Sacred Heart to cultivate and discipline its students based on Catholic doctrine. Without the autonomy to shape the community it desires, Sacred Heart cannot function as intended. Parents who selected Sacred

Heart because of its religiosity will be forced to withdraw their children from the school.

### 2.  The Act forces Sacred Heart to adopt policies that violate its Catholic faith.

Sacred Heart exists to do more than teach academic subjects. It aims to shape students as Catholic men and women, rooted in the Church's doctrines. To accomplish this mission, Sacred Heart has adopted several policies that reflect what the Church teaches as true. Sacred Heart requires student to wear sex-specific uniforms, use sex-specific restrooms, and play on sports teams consistent with students' sexes.

The Act considers these policies impermissible discrimination. It will force Sacred Heart to affirm sexual identities inconsistent with an individual's sex. It will require the school to furnish access to private spaces, sports teams, and uniforms inconsistent with students' sex. And it will require Sacred Heart to retain staff and students whose lives are publicly opposed to the Catholic faith and its doctrine.

By doing so, the Act burdens Sacred Heart's religious exercise. And it does so in a way that is not neutral or generally applicable. Consider the BFOQ exemption for the Employment Provision. That exemption empowers the State, in its sole discretion, to determine what employers have "good enough" reasons to violate the Act and which ones do not—which positions call for "religious enough" employees and which

do not. Such individualized assessments are a hallmark of a law not generally applicable. *Fulton*, 141 S. Ct. at 1877.

### C.  Michigan's laws violate Parents' fundamental parental rights.

Applying Michigan's laws to Sacred Heart harms the Parents, too. The Fourteenth Amendment protects parents' fundamental interest in the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). "[P]erhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court," *id.*, parents' ability to raise their children as they think best is deeply rooted in this country's history and tradition. *Yoder*, 406 U.S. at 233– 34; *see also Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). It is such an "enduring American tradition" that the Supreme Court calls this liberty interest "beyond debate." *Yoder*, 406 U.S. at 232.

That's especially true of parents' right to "control the education of their own" children. *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923); *accord Pierce v. Soc'y of Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925). "The child is not the mere creature of the State;" parents have the "right" and "high duty" "to recognize and prepare [children] for additional obligations." *Pierce*, 268 U.S. at 534– 35. Governments cannot "unreasonably interfere[ ]" with this right by, for instance, forcing a child to enroll in a public school over a Catholic

school against parents' desires, *id.*, or even by forcing children to have a formal education altogether, *Yoder*, 406 U.S. at 218.

Here, Parents all have a religious obligation to educate their children in the Catholic faith because they believe that "[f]atherhood and motherhood represent a responsibility which is not simply physical but spiritual in nature." Pope John Paul II, *Gratissimam Sane*, Letter to Families 12 (1994) (emphasis omitted). Parents believe that parents have the "first responsibil[ity] for the education of their children" and must "choos[e] schools that will best help them in their task as Christian educators." Catechism of the Catholic Church ¶ 2223. They have turned to Sacred Heart to fulfill this calling.

Yet Michigan's laws burden Parents' fundamental parental rights. When Sacred Heart is forced to hire employees whose lives contradict Catholic teaching, it exposes children to the very ideologies that Parents reject. Michigan's interference with Parents' prerogatives "will in large measure influence, if not determine, the religious future of the child." *Yoder*, 406 U.S. at 232.

### D. As applied to Sacred Heart, Michigan's Act cannot survive strict scrutiny.

The Act violates Sacred Heart's free-speech and free-exercise rights, invades its religious autonomy, and burdens Parents' fundamental parental rights; it is therefore presumptively unconstitutional. *R.A.V.*, 505 U.S. at 382. A "content-discriminatory law has two ways to

survive a First Amendment challenge: it must either pass 'rigorous' means-end scrutiny, or fit within a carefully 'delimit[ed]' long-standing tradition." *Tingley v. Ferguson*, 57 F.4th 1072, 1079 (9th Cir. 2023) (O'Scannlain, J., statement on the denial of rehearing en banc) (quoting *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 553 (6th Cir. 2020) (Murphy, J., concurring in the judgment)). Michigan's Act cannot meet either test.

Michigan has no compelling interest in applying the Act against Sacred Heart's constitutional prerogatives. Though Michigan may claim an interest in combating discrimination, that defines the interest "at [too] a high level of generality." *Fulton*, 141 S. Ct. at 1881. The First Amendment demands "a more precise analysis" that asks not "whether [Michigan] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in" applying it against Sacred Heart specifically. *Id.*; *accord Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (holding that a compelling interest must be justified as to the "particular … claimant[ ]"). Properly focused, Michigan's interest falls flat.

Though Sacred Heart remains committed to Catholic doctrine on sexuality and gender, it welcomes all students, including those experiencing same-sex attraction and gender confusion. The school has enrolled and currently enrolls such students. To force Sacred Heart to violate its beliefs would do nothing to stop discrimination, since Sacred

Heart *does not* discriminate. What's more, to bar Sacred Heart from explaining Catholic doctrine to prospective students, job applicants, and the public harms, not helps, them—it hides the most relevant information regarding the school and its curriculum.

Additionally, as applied to Sacred Heart, the Act is not narrowly tailored. "A narrowly tailored regulation … actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and" cannot "be replaced" by a regulation "that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005). "[S]o long as the government can achieve its interests in a manner that does not burden religion"—or speech—"it *must* do so," *Fulton*, 141 S. Ct. at 1881 (emphasis added) (religion); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (speech). Michigan's Act fails on all fronts.

Michigan could, for instance, exempt religious organizations from its Employment Provision; federal law already does, 42 U.S.C. § 2000e-1(a), as do most states, *e.g.*, Ohio Rev. Code Ann. § 4112.02. This shows that Michigan's anti-religious approach is not the least-restrictive alternative possible.

## III.  The remaining factors favor preliminarily enjoining the Act.

Sacred Heart has demonstrated that it is likely to succeed on the merits; that is the "crucial inquiry" in First Amendment cases. *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012). But the other factors weigh in Sacred Heart's favor, too. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and that harm is always "sufficient to justify injunctive relief," *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998). And it's "always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge,* 23 F.3d at 1079.

## CONCLUSION

Michigan's Act will compel Sacred Heart to speak messages it disagrees with, retain employees and students inimical to its faith, and adopt policies contrary to the school's religious beliefs. The Act's application will deprive Parents of the right to raise their children with a classical Catholic education. Sacred Heart has standing to challenge this application. And because Sacred Heart is likely to succeed on the merits, this Court should reverse and instruct the lower court to enter the requested preliminary injunction.

Dated: November 15, 2023

Respectfully submitted,

*s/Cody S. Barnett*

Cody S. Barnett
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

David A. Cortman
Ryan J. Tucker
Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
dcortman@ADFlegal.org
rtucker@ADFlegal.org
kanderson@ADFlegal.org

*Counsel for Plaintiffs-Appellants*

**FRAP 32(g)**

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,971 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: November 15, 2023

*s/Cody S. Barnett*
Cody S. Barnett

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/Cody S. Barnett*
Cody S. Barnett

*Counsel for Plaintiffs-Appellants*

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g), Plaintiffs-

Appellants designate the following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| 1 | Verified Complaint | 1–74 |
| 1-2 | Exhibit 1 to Verified Complaint – Student Handbook | 76–110 |
| 1-4 | Exhibit 3 to Verified Complaint – Faculty Memo and Oath | 113–118 |
| 1-6 | Exhibit 5 to Verified Complaint – Previous Job Postings | 121–126 |
| 1-8 | Exhibit 7 to Verified Complaint – Statement on Catholic Doctrine | 135–137 |
| 1-10 | Exhibit 9 to Verified Complaint – Current Job Postings | 143–149 |
| 23 | Brief in Support of Defendants' Motion to Dismiss | 364–414 |
| 29 | Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss | 493–556 |
| 29-4 | Appendix in Support of Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss | 574–749 |
| 32 | Reply Brief in Support of Defendants' Motion to Dismiss | 756–779 |

| 34-2 | Exhibit A to Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Dismiss – Catholic Charities Notice of Certified Complaint | 799–807 |
|---|---|---|
| 44 | Opinion and Order | 930–961 |
| 46 | Notice of Appeal | 963–965 |