No. 23-1781

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SACRED HEART OF JESUS PARISH, GRAND RAPIDS; JERRY HATLEY; ROBIN HATLEY; JOSEPH BOUTELI; RENEE BOUTELI; PETER UGOLINI; KATIE UGOLINI,

*Plaintiffs-Appellants,*

v.

DANA NESSEL in her official capacity as Attorney General of Michigan; JOHN E. JOHNSON, JR., in his official capacity as Executive Director of the Michigan Department of Civil Rights; et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:22-cv-01214

**BRIEF OF THE JEWISH COALITION FOR RELIGIOUS LIBERTY AND THE RELIGIOUS FREEDOM INSTITUTE'S ISLAM AND RELIGIOUS FREEDOM ACTION TEAM AS *AMICI CURIAE* IN SUPPORT OF NEITHER PARTY**

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
Miles E. Coleman
Adam B. McCoy
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

*Attorneys for* Amici Curiae

## <span style="font-variant: small-caps;">Rule 26.1 Disclosure Statements</span>

Pursuant to Fed. R. App. P. 26.1 and Sixth Circuit R. 26.1(a), *amici curiae* the Jewish Coalition for Religious Liberty and the Religious Freedom Institute state that they have no parent corporations, do not issue stock, are not subsidiaries or affiliates of a publicly owned corporation, and there is no publicly owned corporation or its affiliate, not a party to this appeal, that has a financial interest in the outcome of this case.

TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

INTEREST OF *AMICI CURIAE* .....................................................1

SUMMARY OF THE ARGUMENT .................................................2

ARGUMENT.................................................................................5

I.    State deference to religious groups' personnel decisions serves important constitutional interests. ............5

    A.    Deference preserves religious groups' autonomy. .........7

    B.    Deference recognizes and respects the unique expertise and self-knowledge of religious groups..........9

    C.    Deference preserves the rights of religious minorities. ..................................................................13

    D.    Deference avoids entanglement.................................17

II.    State deference to religious groups' personnel decisions is settled policy that every branch of the federal government has adopted and illustrated in a variety of contexts. ...........19

    A.    Congress has consistently included coreligionist exemptions in federal laws regulating private employment..............................................................20

    B.    The executive branch has also recognized the existence of a coreligionist exemption. ........................21

    C.    The judicial branch recognizes the coreligionist exemption for religious groups. ...................................22

III.    A restriction of religious groups' ability to make religiously informed personnel decisions would have an especially deleterious effect on minority religious groups. ...................26

CONCLUSION ...........................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Board of Jewish Education,*
210 N.L.R.B. 1037 (1974).........................................................22

*Boy Scouts of America* v. *Dale,*
530 U.S. 640 (2000)...............................................................11

*Cantwell* v. *Connecticut,*
310 U.S. 296 (1940)...............................................................14

*Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah,*
508 U.S. 520 (1993)...............................................................15

*City of Boerne* v. *Flores*
521 U.S. 507 (1997)...............................................................6

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *Amos,* 483 U.S. 327 (1987) (Brennan, J., concurring) ..............................................................5, 8, 17

*Curay-Cramer* v. *Ursuline Acad. of Wilmington,*
450 F.3d 130 (3d Cir. 2006) ..................................................25

*EEOC* v. *Mississippi Coll.,*
626 F.2d 477 (5th Cir. 1980)..................................................25

*Employment Division* v. *Smith,*
494 U.S. 872 (1990)...............................................................18

*Fulton* v. *City of Philadelphia,*
141 S. Ct. 1868 (2021)...........................................................19

*Hall* v. *Baptist Mem'l Health Care Corp.,*
215 F.3d 618 (6th Cir. 2000)...........................................23, 24

*Holt* v. *Hobbs,*
574 U.S. 352 (2015)..........................................................14, 16

iv

*Hosanna-Tabor Evangelical Lutheran Church and School*
    v. *EEOC*, 565 U.S. 171 (2012) (Alito, J., joined by
    Kagan, J., concurring) ................................................ 6, 10, 11, 13, 14

*Kennedy* v. *St. Joseph's Ministries, Inc.*,
    657 F.3d 189 (4th Cir. 2011) ..............................................25

*Killinger* v. *Samford Univ.*,
    113 F.3d 196 (11th Cir. 1997) ............................................26

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ..............................................25

*Kunda* v. *Muhlenberg College*,
    621 F.2d 532 (3d Cir. 1980) ...............................................12

*Little* v. *Wuerl*,
    929 F.2d 944 (3d Cir. 1991) ......................................5, 17, 25

*New York* v. *Cathedral Acad.*,
    434 U.S. 125 (1977)...........................................................23

*Our Lady of Guadalupe School* v. *Morrissey-Berru*,
    140 S. Ct. 2049 (2020)..................................................10, 11

*Presbyterian Church in U.S.* v. *Mary Elizabeth Blue Hull*
    *Mem'l Presbyterian Church*,
    393 U.S. 440 (1969)...........................................................23

*Spencer* v. *World Vision, Inc.*,
    633 F.3d 723 (9th Cir. 2011).............................10, 11, 14, 26

*St. Edmund's Roman Catholic Church*,
    337 N.L.R.B. 1260 (2002)..................................................22

*Thomas* v. *Review Bd. of Indiana Employment Sec. Div.*,
    450 U.S. 707 (1981)...........................................................15

**Statutes**

42 U.S.C. 2000e-1 ...................................................................20

42 U.S.C. 12113(d)(2) .............................................................21

Pub. L. No. 92-261, § 3, 86 Stat. 103.......................................20

**Other Authorities**

43 Fed. Reg. 49, 240 49, 243 (Oct. 20, 1978)............................21

85 Fed. Reg. 79, 324, 79, 344–45 (Dec. 9, 2020) .....................22

Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373, 1399 (1981).........................................................................................8

Kimberly Winston, *Defense Department expands its list of recognized religions*, RELIGIOUS NEWS SERVICE (April 21, 2017), https://religionnews.com/2017/04/21/defense-department-expands-its-list-of-recognized-religions/.............................11

*The Ministerial Exception to Title VII: The Case for A Deferential Primary Duties Test*, 121 HARV. L. REV. 1776, 1792 (2008).........................................................................11

*Musnad Ahmad ibn Hanbal*, Vol. 12 (Ahmad Zayn, ed.) (1994)................................................................................27

P. Kauper, RELIGION AND THE CONSTITUTION 17 (1964) .........................7

Ronald J. Krotoszynski, Jr., *Why Deference?: Implied Delegations, Agency Expertise, and the Misplaced Legacy of Skidmore*, 54 ADMIN. L. REV. 735, 741 (2002) ................................12

*Ṣaḥiḥ Ibn Ḥibban bi-Tartib Ibn Balaban*, Vol. 2 at 262 (Shuʿayb al-Arnaʾuṭ, ed.) (1993)...........................................27

Sepehr Shahshahani and Lawrence J. Liu, *Religion and Judging on the Federal Courts of Appeal*, 14 JOURNAL OF EMPIRICAL LEGAL STUDIES 716 (2017) ................................................13

*Update on the Justice Department's Enforcement of RLUIPA, 2010-16, available at* https://www.justice.gov/crt/file/877931/ ......................................15, 16

### INTEREST OF *AMICI CURIAE*[1]

**The Islam and Religious Freedom Action Team** ("IRF") of the Religious Freedom Institute amplifies Muslim voices on religious freedom, seeks a deeper understanding of the support for religious freedom inside the teachings of Islam, and protects the religious freedom of Muslims. To this end, the IRF engages in research, education, and advocacy on core issues including freedom from coercion in religion and equal citizenship for people of diverse faiths. The IRF explores and supports religious freedom by translating resources by Muslims about religious freedom, fostering inclusion of Muslims in religious freedom work both where Muslims are a majority and where they are a minority, and by partnering with the Institute's other teams in advocacy.

**The Jewish Coalition for Religious Liberty** ("JCRL") is an association of lawyers, rabbis, and communal professionals who practice

---

[1] *Amici curiae* submit this brief accompanied by a motion for leave of the Court pursuant to Federal Rule of Appellate Procedure 29(a)(2). Counsel for the parties were informed of this filing. Plaintiffs-Appellants consented; Defendants-Appellees did not consent, but stated they would not oppose the Motion for Leave to File.

Counsel for *amici curiae* states pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) that no party or party's counsel authored this brief in whole or in part, and no person other than *amici* and their counsel contributed money intended to fund preparing or submitting this brief.

Judaism and are committed to religious liberty. As adherents of a minority religion, its members have a strong interest in ensuring that religious liberty rights are protected.

Though the facts underlying this appeal do not involve Islamic or Jewish expression or beliefs, the issue of religious entities' right to hire coreligionists is of great concern to all faith groups and to minority faiths especially. In particular, *amici* fear that the misapplication or retrenchment of the coreligionist exemption would have an especially deleterious effects on adherents of minority religious faiths who often organize collectively to learn, teach, act, and serve as an expression and exercise of their faith.

## SUMMARY OF THE ARGUMENT

This appeal presents questions of standing, ripeness, free speech, compelled speech, and employment law. *Amici* write to address one question and one alone: whether the First Amendment protects religious groups' authority and autonomy to decide which roles and responsibilities should be limited to coreligionists. *Amici* take no position on which party should prevail in this specific appeal. Rather, *amici* write to aid the Court's understanding of the coreligionist exemption and to explain the

deleterious effect that a limitation or revocation of that right would have on religious groups in general and on minority religious groups in particular.

1. The coreligionist exemption serves significant constitutional interests by deferring to religious organizations' own determination of which roles and responsibilities are so tied to the group's religious mission that they may be filled only by fellow believers. Properly applied, the exemption preserves the autonomy of religious groups; recognizes and respects their unique knowledge of and expertise in their religious beliefs, missions, motivations, and practices; preserves the free exercise rights of religious groups; and prevents state entanglement with religious groups and doctrines.

The alternative proffered by the defendants in this appeal—a discretionary exemption scheme that starts with a burdensome application process and ends by hoping a that bureaucrat will deign to dole out an exemption—does not alleviate *amici*'s concerns. Rather, it exacerbates them, raises significant entanglement concerns, and shows that the state regime is not a neutral and generally applicable law.

2.   The coreligionist exemption is well established. It has been consistently recognized by all three branches of the federal government. Congress, for example, has regularly recognized the coreligionist exemption as part of enactments governing private employment. The executive branch has implemented the coreligionist exemption through executive orders and regulations. The federal judiciary has also recognized the exemption. It is consistent with Supreme Court precedent in closely analogous areas, and each of the six federal circuits (including this one) to consider the issue has deferred to religious groups' religiously informed employment decisions.

3. The absence of a robust coreligionist exemption would have a disproportionate and especially deleterious effect on minority faiths and unfamiliar faith groups. While adherents of all faiths would bear the adverse effect of a limitation on or retraction of the exemption, that risk would fall with particular weight on minority faith groups. Such groups are less familiar to state agencies, officials, and courts, and are, therefore, at increased risk of the erosion of their religious identity and autonomy, the imposition of coercive pressure on them to conform in belief and practice to prevailing secular definitions of roles, and the potential of self-

censorship that forces the alteration, limitation, or abandonment of aspects of a religious group's mission and religious practices.

ARGUMENT

## I.  State deference to religious groups' personnel decisions serves important constitutional interests.

Whether raised in a pre-enforcement challenge (as here) or asserted as a defense to an eventual enforcement action, the coreligionist doctrine serves a vital and long-standing role in preserving free exercise and associational rights while simultaneously avoiding undue entanglement. It recognizes that religious organizations have a constitutional right to recruit, hire, and retain employees who share the group's religious beliefs, and, accordingly, it exempts such groups from employment laws that would otherwise forbid religious discrimination in employment decisions. *See Little* v. *Wuerl*, 929 F.2d 944, 948 (3d Cir. 1991) (stating that any attempt "to forbid religious discrimination against non-minister employees where the position involved has any religious significance is uniformly recognized as constitutionally suspect, if not forbidden").

Stated differently, the coreligionist exemption allows religious organizations to determine that certain positions, including non-ministerial ones, are so imbued with religious significance that those

positions should be occupied only by employees who assent and adhere to certain religious tenets. *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* v. *Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring) (stating that the First Amendment protects religious organizations' right to define themselves by deciding "that certain activities are in furtherance of [their] religious mission, and that only those committed to that mission should conduct them").

The coreligionist exemption is a critical precedent that allows religious groups to continue their existence and their purpose by guaranteeing their right to associate, through employment, with those who share the faith of the religious group and exemplify that faith by the way they live. It thus preserves not only the free exercise of religion but also the freedom of association. *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., joined by Kagan, J., concurring) (noting that religious groups are "dedicated to collective expression and propagation of shared religious ideals").

Allowing religious organizations to maintain selectivity when deciding with whom to associate furthers critical First Amendment values, even when—and perhaps especially when—it lifts a burden that

would otherwise impinge on religious groups' autonomy, free exercise, or associational rights. *See City of Boerne* v. *Flores* 521 U.S. 507, 563 (1997) ("[O]ur whole religious history . . . supports the conclusion that religious liberty is an independent liberty, that its recognition may either require or permit preferential treatment on religious grounds in some instance[.]" (*quoting* P. Kauper, RELIGION AND THE CONSTITUTION 17 (1964)).

The constitutional interests of autonomy, association, free exercise, and avoidance of entanglement are all furthered by state deference to religious groups' determination of which roles and responsibilities should be filled by fellow believers. These interests are discussed in turn below.

### A.  *Deference preserves religious groups' autonomy.*

Respect for religious groups' independence and self-determination requires deference to the groups' individual determinations of how the tenets of their faith impact employment decisions. That's true whether the threatened enforcement comes at the hands of a court or a state agency. Writing for the Supreme Court over three decades ago, Justice White described the dangers posed to religious autonomy by governmental intervention in religious practice:

> [I]t is a significant burden on a religious organi-
> zation to require it, on pain of substantial liability,

>to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission.

*Amos*, 483 U.S. at 336. Legal commentators have recognized similar autonomy concerns:

>Even if government policy and church doctrine endorse the same broad goal, the church has a legitimate claim to autonomy in the elaboration and pursuit of that goal. Regulation may be thought of as taking the power to decide a matter away from the church and either prescribing a particular decision or vesting it elsewhere—in the executive, a court, an agency, an arbitrator, or a union. And regulation takes away not only a decision of general policy when it is imposed, but many more decisions of implementation when it is enforced.

Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 COLUM. L. REV. 1373, 1399 (1981).

In short, both courts and legal scholars recognize the straightforward and somewhat common-sense proposition that state determination of what has "religious significance" to a given religion necessarily deprives religious groups of the autonomy to make that decision for themselves.

8

This is particularly true for religions like *amici*'s that are broad enough to include differing strands or denominations that may not themselves agree on all the particulars of the interpretation, application, and outworking of their faith. It is far too simplistic to think, for example, that a court could simply apply "the Jewish view" or "the Muslim view" when analyzing a Jewish or Muslim organization's assertion of the coreligionist exception, as if each faith group were a monolithic entity without internal variations and nuances of faith and practice.

Respect for religious autonomy, then, is critical for religious groups to preserve the autonomy to make individual determinations of how the tenets of their faith impact employment decisions. That constitutional interest is protected and furthered by the coreligionist exemption, and, in its absence, would be significantly eroded.

## B. *Deference recognizes and respects the unique expertise and self-knowledge of religious groups.*

Religious groups' unique knowledge and expertise of their own religious traditions require deference to the groups' own determinations of how the tenets of their faiths affect the qualifications for specific roles. This is particularly true in a diverse and pluralistic society. For example, in the closely related, but doctrinally distinct, context of the ministerial

exception, the Supreme Court has recognized that "judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition." *Our Lady of Guadalupe School* v. *Morrissey-Berru*, 140 S. Ct. 2049, 2066 (2020); *see also Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring) (noting that "virtually every religion in the world is represented in the population of the United States" and that different faith traditions view the qualifications, roles, and definitions of various employees very differently).

Judge O'Scannlain recognized a similar point in his concurring opinion in *Spencer* v. *World Vision, Inc.*, asking: "[i]f we are ill-equipped to determine whether an activity or service is religious or secular in nature, how are we to know which side of the line an entity's 'purpose' falls on?" 633 F.3d 723, 732 (9th Cir. 2011) (O'Scannlain, J., concurring). He continued:

> The same is true for factors which ask this court to determine whether an organization includes 'prayer' or 'worship' in its activities, or whether it disseminates a 'religious' curriculum. . . . In such a scenario, it is questionable whether a court is competent to distinguish religious speech (or instruction) from other activities.

10

*Spencer*, 633 F.3d at 732 n.8. In a country with at least 221 recognized religions, it would be impossible for any judge or state official to understand the central tenets, much less the scope of activities, of all those religious groups. *See* Kimberly Winston, *Defense Department expands its list of recognized religions*, RELIGIOUS NEWS SERVICE (April 21, 2017), https://religionnews.com/2017/04/21/defense-department-expands-its-list-of-recognized-religions/.

If the government lacks that expertise, then who should make those determinations? The faith groups themselves. *Our Lady of Guadalupe*, 140 S. Ct. at 2066; *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring); *Spencer*, 633 F.3d at 732 (O'Scannlain, J., concurring); Note, *The Ministerial Exception to Title VII: The Case for A Deferential Primary Duties Test*, 121 HARV. L. REV. 1776, 1792 (2008).

That standard comports with the standard applied in a variety of contexts when organizations are routinely granted deference based on their unique self-knowledge or expertise. For example, in expressive association cases, the Supreme Court gave deference to an association's own assertions regarding the nature of its expression. *See Boy Scouts of America* v. *Dale*, 530 U.S. 640, 653 (2000) ("As we give deference to an

association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression."). In academic promotion or tenure cases, courts have been willing to defer to the expertise of educators. *See*, *e.g.*, *Kunda* v. *Muhlenberg College*, 621 F.2d 532, 548 (3d Cir. 1980) ("Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges."). Perhaps most famously, many early decisions on deference to administrative agencies were based at least in part on agency expertise. *See* Ronald J. Krotoszynski, Jr., *Why Deference?: Implied Delegations, Agency Expertise, and the Misplaced Legacy of Skidmore*, 54 ADMIN. L. REV. 735, 741 (2002) ("*Skidmore*, *Chenery*, and *Cement Institute* all invoke enhanced agency expertise as the rationale for affording agency work product deference on judicial review.").

If deference is appropriate in those cases, it is equally (or more) appropriate to apply in respect to religious groups' unique self-knowledge.

**C.** *Deference preserves the rights of religious minorities.*

Deference to religious groups' own determination of which roles are reserved for coreligionists preserves the rights of religious minorities especially, whose traditions may be less familiar to judges or state regulators. To the extent judges' own religious preferences or affiliations may inform their decisions in a particular case, it is noteworthy that many courts are composed almost exclusively of jurists from a Judeo-Christian heritage. *See* Sepehr Shahshahani and Lawrence J. Liu, *Religion and Judging on the Federal Courts of Appeal*, 14 JOURNAL OF EMPIRICAL LEGAL STUDIES 716 (2017) (describing the religious affiliation of federal appellate judges).[2] Although these judges may be familiar their own faith traditions, they are almost certainly less familiar with other faith traditions. This lack of familiarity necessarily hinders any attempt to judicially define religious significance.

Justice Thomas recognized this point in the context of the ministerial exception in his concurring opinion in *Hosanna-Tabor*: "[j]udicial attempts to fashion a civil definition of 'minister' through a

---

[2] The Senate confirmed the Honorable Zahid Quraishi as a United States District Judge on June 10, 2021. Judge Quraishi is the first Article III judge of the Muslim faith in American history.

bright-line test or multifactor analysis risk disadvantaging those religious groups whose beliefs, practices, and membership are outside of the 'mainstream' or unpalatable to some." 565 U.S. at 197 (Thomas, J., concurring). Judge O'Scannlain acknowledged a similar point in his concurrence in *Spencer*: "While these questions [about the scope of an organization's religious activities] are relatively easy in some contexts, they might prove more difficult when dealing with religions whose practices do not fit nicely into traditional categories." 633 F.3d at 732 n.8.

The Supreme Court has consistently recognized that religious believers are burdened when they are forced to "engage in conduct that seriously violates [their] religious beliefs." *Holt* v. *Hobbs*, 574 U.S. 352, 361 (2015) (concluding that such a plaintiff "easily satisfie[s]" RLUIPA's requirement of a substantial burden); *cf. Cantwell* v. *Connecticut*, 310 U.S. 296, 303–04 (1940) (noting that the First Amendment "safeguards the free exercise of the chosen form of religion," and thus "embraces two concepts—freedom to believe and freedom to act").

For religious minorities, this possibility often exists as a reality. The inability to freely practice one's faith creates a grim set of choices for religious minorities. They can move, hoping that the next place will be

better than the last. They can fight, facing whatever state punishment comes in response. But because both of these options are generally so difficult, a third possibility—abandoning the faith or elements of it—becomes the most likely. *See Thomas* v. *Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981) (noting how even the denial of a discretionary government benefit puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs").

Sometimes religious minorities face outright persecution. *See, e.g., Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520 (1993); *see also* U.S. Department of Justice, *Update on the Justice Department's Enforcement of RLUIPA, 2010-16*, at 6, *available at* https://www.justice.gov/crt/file/877931/download (noting "particularly severe discrimination faced by Muslims in land use"). America is large and diverse—and heterogeneous as well. Evangelical Christians have special trouble on the coasts; nonbelievers have special trouble in the South; others, like Sikhs, Muslims, and Hare Krishnas can have trouble anywhere they go.

Yet even putting aside outright hostility, religious minorities also face a lack of awareness, combined with the almost reflexive hesitation

many officials have about making "exceptions" to the "rules." Indeed, the Supreme Court has diagnosed the problem well, pointing out how "argument[s] for uniformity" can arise "in response to *any* [] claim for an exception to a generally applicable law." *Gonzales*, 546 U.S. at 435–36 (emphasis added). This visceral antipathy toward exemptions, the Court said, is the "classic rejoinder of bureaucrats throughout history." *Id.* at 436. Encountering the same sort of argument in another case a decade later, the Supreme Court repeated the lament about bureaucrats and dismissively rejected the government's rationales as "hard to take seriously." *Holt* v. *Hobbs*, 574 U.S. 352, 363 (2015).

The uniquely difficult burden placed on religious minorities, in a world where their traditions are often completely foreign to the state emphasizes the importance of deference to religious minorities in their employment decisions based on the tenets of their faith. Refusing to allow deference greatly increases the odds that minority religious groups will be subjected to exactly what the Supreme Court feared in being forced to "engage in conduct that seriously violates [their] religious beliefs." *Holt*, 574 U.S. at 361.

16

**D.     *Deference avoids entanglement.***

Deference to religious groups' determinations not only protects the rights of those groups, it also prevents the state from straying onto terrain where it ought not go. For one, it prevents "the kind of intrusive inquiry into religious belief" that the Supreme Court has condemned. *Amos*, 483 U.S. at 339. Further, as the Third Circuit explained in *Little* v. *Wuerl*, the application of employment non-discrimination laws to religious groups "would be constitutionally suspect because it would arguably violate both the free exercise clause and the establishment clause of the first amendment." 929 F.2d 944, 947 (3d Cir. 1991). In explaining the potential problem of excessive entanglement, the Third Circuit noted:

> [T]he inquiry into the employer's religious mission is not only likely, but inevitable, because the specific claim is that the employee's beliefs or practices make her unfit to advance that mission. It is difficult to imagine an area of the employment relationship less fit for scrutiny by secular courts. Even if the employer ultimately prevails, the process of review itself might be excessive entanglement.

*Id.* at 949.

So too here, where the likelihood of state entanglement is significantly *increased*, not mitigated (much less alleviated) by the so-

17

called Bona Fide Occupation Qualification ("BFOQ") process that Michigan has established to grant exceptions to the state laws at issue. Such exemptions are available, however, only if the religious group first hires an attorney, prepares a legal brief, responds to questions for each of its positions, justifies why it's necessary to fill those positions with someone who shares the group's faith, and discusses compelling reasons why a non-religious person could not reasonably perform the duties. *See* BFOQ Application, R.22–4, PageID#703–704.

Even then, after providing this extensive information, the fate of the requested exemption is in the *exclusive discretion* of state bureaucrats. *See* MCL 37.2208. This scheme tees up the very problem that the coreligionist exemption is meant to avoid. It also demonstrates that the state law regime Michigan has erected is not a "neutral and generally applicable" law that warrants a more deferential level of scrutiny under *Employment Division* v. *Smith*, 494 U.S. 872, 879 (1990). The Supreme Court has made clear that "[a] law is *not* generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individuals exemptions.'" *Fulton* v. *City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

18

In sum, rather than resolving the First Amendment questions raised by the state law regime, the BFOQ process exacerbates those concerns. The BFOQ process *necessarily* entangles the state in evaluating, reviewing, and deciding the validity, sincerity, reasonableness, and religious necessity of decisions made by religious groups regarding the religious nature and role of specific responsibilities. The BFOQ process places the government squarely athwart the First Amendment by purporting to evaluating the validity of the religiously-motivated employment decisions that were made based on the employer's religious beliefs. This refusal to defer to religious groups' understanding of their own faiths and practices is in direct contradiction to the coreligionist exemption and the First Amendment interests that it embodies.

## II.   State deference to religious groups' personnel decisions is settled policy that every branch of the federal government has adopted and illustrated in a variety of contexts.

*Amici* express no view on which party should prevail in this appeal. Rather, *amici* write merely to note that a state policy refusing to accept and apply the coreligionist exemption would differ from over 50 years of precedent established by all three branches of the federal government.

19

Congress, for example, has consistently written coreligionist exemptions into its federal laws regulating private employment and has made clear that it not only respects the First Amendment protections of freedom of religion but is actively working to protect the coreligionist exemption. The executive branch has also taken actions to recognize the right to a coreligionist exemption. Perhaps most strikingly, the judicial branch, through the Supreme Court (implicitly) and six federal circuits (expressly) has recognized a coreligionist exemption. These examples and the lessons they teach are summarized below.

## A.    *Congress has consistently included coreligionist exemptions in federal laws regulating private employment.*

Congress has long recognized the coreligionist exemption in its crafting of federal laws that regulate private employment. Congress enacted the Equal Employment Opportunity Act of 1972 to expand the religious exemption of Title VII of the Civil Rights Act of 1964 to include all "work connected with the carrying on by [religious groups] of [their] activities." Pub. L. No. 92-261, § 3, 86 Stat. 103, 103-04 (codified as 42 U.S.C. 2000e-1). This expansion exempted religious employers from the general ban on discrimination and allowed religious employers to

discriminate on the basis religion regardless of whether the particular role is ministerial or even overtly religious.

Congress continued to recognize the coreligionist exemption in other laws such as the American with Disabilities Act of 1990, which included a similar coreligionist exemption that allows a religious group to "require all applicants and employees conform to the religious tenets" of the organization. 42 U.S.C. 12113(d)(2). These actions from Congress demonstrate the intent of the coreligionist exemption as allowing for religious groups to condition employment on following the religious tenets of the organization even if such employee would otherwise be protected under a separate law and of deferring to the religious groups to determine themselves if employees align with the religious beliefs of the organization.

### B.    *The executive branch has also recognized the existence of a coreligionist exemption.*

The federal executive branch has consistently recognized that religious groups have a First Amendment right to the coreligionist exemption. This is illustrated in regulations issued by the Department of Labor. *See* 43 Fed. Reg. 49, 240 49, 243 (Oct. 20, 1978) (importing Title VII's exemption of religious schools). The Department of Labor has

confirmed that religious contractors are allowed to require employees' "adherence to [their] faith's tenets in word and deed," as those "tenets [are] understood by the employing contractors." 85 Fed. Reg. 79, 324, 79, 344–45 (Dec. 9, 2020). This is a direct implementation of the coreligionist exemption by the Department of Labor.

Additionally, presidential administrations—both Republican and Democrat—have maintained for over 20 years President George W. Bush's importation of Title VII's main religious exemption. *See* Exec. Order No. 13279 § 4(c), 67 Fed. Reg. 77,141, 77,143 (Dec. 16, 2002). This is in alignment with the National Labor Relations Board that generally declines to assert jurisdiction over religious organizations and defers to their employment decisions. *St. Edmund's Roman Catholic Church*, 337 N.L.R.B. 1260, 1260 (2002); *Bd. of Jewish Educ.*, 210 N.L.R.B. 1037, 1037 (1974). The executive branch, in the Oval Office and in multiple executive branch departments, has demonstrated a bipartisan commitment to respecting religious groups' right to the coreligionist exemption.

## C.    *The judicial branch recognizes the coreligionist exemption for religious groups.*

The Supreme Court has been consistently clear that religious organizations should maintain independence to practice their religious

beliefs with autonomy. *See, e.g., Presbyterian Church in U.S.* v. *Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969) (preventing states from interpreting church doctrines and the importance of those doctrines to religion); *New York* v. *Cathedral Acad.*, 434 U.S. 125, 133 (1977) (preventing states from deciding what does or does not have religious meaning).

The lower courts have likewise recognized the important interests furthered by the coreligionist exemption. The federal circuit courts are confronted more often than the Supreme Court with issues of suppression of religious belief or practice and they have consistently recognized a coreligionist exemption. Indeed, *this* Court has recognized a coreligionist exemption in ruling against an employee of a religious college who was terminated from her position as a student-services specialist after it was disclosed that she did not share or adhere to the religious college's beliefs. *Hall* v. *Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 622–23 (6th Cir. 2000). It was undisputed in the case that she was a good employee and had received no disciplinary actions. *Id.* at 623. The employee was terminated after it came to light that her beliefs and behaviors diverged

from those of her religious employer, which the employer deemed created a "conflict of interest" with its religious beliefs. *Id.*

In upholding the district court's decision to dismiss the case, this Court said, "the First Amendment does not permit federal courts to dictate to religious institutions how to carry out their religious missions or how to enforce their religious beliefs." *Id.* at 626. This Court also recognized there is a "constitutionally-protected interest of religious groups in making religiously-motived employment decisions." *Id.* at 623. The decision to uphold the firing for religious reasons shows this Court's recognition that the coreligionist exemption is recognized as giving the freedom to religious groups to make employment decisions based on whether the employee is willing to adhere to the religious tenets of the groups. Additionally, this Court recognized that the religious groups are best positioned to carry out their religious beliefs and make employment decisions regarding the types of employees that align with the organization's religious beliefs.

The Third Circuit has upheld a religious school's right not to renew a teacher's contract based on her divorce and also declined to apply Title VII to stop discrimination against non-minister employees if the position

involved religious significance. *Little* v. *Wuerl*, 929 F.2d 944, 945–46 (3d Cir. 1991). The Third Circuit has also held religious schools have autonomy to make employment decisions, and the First Amendment prohibits inquiring "into a religious employers' religious mission or the plausibility of its religious justification for an employment decision. *Curay-Cramer* v. *Ursuline Acad. of Wilmington*, 450 F.3d 130, 137, 139, 141 (3d Cir. 2006).

The Fourth Circuit held religious groups are allowed to terminate an employee for wearing clothes that conflict with the religious group's principals. *Kennedy* v. *St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011). The Fifth Circuit went so far as to rule that the Equal Employment Opportunity Commission lacked jurisdiction to investigate whether the religious reason for a firing was a pretext to a non-religious reasoning. *EEOC* v. *Mississippi Coll.*, 626 F.2d 477, 485 (5th Cir. 1980). The Seventh Circuit has likewise recognized that the coreligionist exemption protects hiring practices. *Korte v. Sebelius*, 735 F.3d 654, 661 (7th Cir. 2013). As previously discussed, Judge O'Scannlain on the Ninth Circuit has recognized that the courts "are ill-equipped to determine whether an activity or service is religious or secular in nature." *Spencer*

633 F.3d at 732 (O'Scannlain, J., concurring). The Eleventh Circuit has also held that religious groups have the right to "employ only persons whose beliefs are consistent with the employer's when the work is connected with carrying out the institution's activities." *Killinger* v. *Samford Univ.*, 113 F.3d 196 (11th Cir. 1997).

In sum, the federal appellate courts (including this one), like the other branches of the federal government, have consistently recognized the coreligionist exemption and the deference owed to religious groups on religious based employment decisions. A ruling concluding otherwise would be an unprecedent departure.

## III. A restriction of religious groups' ability to make religiously informed personnel decisions would have an especially deleterious effect on minority religious groups.

Even assuming *arguendo* that the state was capable of reliably determining what roles and activities have religious significance in faith traditions that they are familiar with, the state is ill equipped to do so in the context of faith traditions whose beliefs, liturgy, roles, spiritual obligations, and duties are unfamiliar to them.

Take *amici*'s faith groups, for example. Across the nation, as around the world, Muslims organize together, often in incorporated form, to serve their communities as an exercise of their faith, often by providing

social services to the poor and needy. To an outsider, these groups and their activities may appear indistinguishable from similar social services provided by the government or by secular charitable organizations. Accordingly, to an outsider, a Muslim individual employed by such a group providing such services may not appear to be engaged in activities related to or in furtherance of a religious mission.

Nothing could be further from the truth. In Islam, the services noted above, as well as other deeds in service of the public good, are commanded in the Hadith. *See*, *e.g.*, *Musnad Ahmad ibn Hanbal*, Vol. 12 at 208 (Ahmad Zayn, ed.) (1994) ("Honor the guest, be generous to the orphan, and be good to your neighbor."); *Ṣaḥiḥ Ibn Ḥibban bi-Tartib Ibn Balaban*, Vol. 2 at 262 (Shuʿayb al-Arnaʾuṭ, ed.) (1993) ("There are rooms in Paradise which God has prepared for those who feed others, spread greetings of peace, and pray at night while others sleep."). Indeed, even a general disposition of friendliness is itself part of the mission of the Muslim believer, and being beneficent to others is thus an activity of religious significance. *See* Abu Hamid Muhammad al-Ghazali, *Ihya Ulum ad-Deen*, Vol. 5 at 112 (2016) ("The believer is friendly and befriended, for

there is no goodness in one who is neither friendly, nor befriended. The best of people are those who are most beneficial to people.").

To a state official unfamiliar with Islam, then, it would be easy erroneously to miss the fact that care for orphans or the needy is of great religious significance, as it is commanded by the Prophet as a way of sharing the faith and carrying out its mission.

So too could a jurist or state official lacking sufficient knowledge of and experience with the Jewish faith erroneously substitute his or her own view of "religious significance" for that of the religion. Activities relating to keeping kosher, for example, are of great religious significance but include conduct that, to an outsider, would not seem overtly religious. Kosher food preparation requires an extensive knowledge of Jewish law and a willingness to adhere to it strictly despite the difficulties that it entails. Kosher laws apply not only to the food that is served at an event; they govern every aspect of the food's preparation. For example, many religious Jews go through a rigorous process of washing vegetables and checking to make sure that they do not contain bugs, because bugs are not kosher. Many religious Jews would not eat vegetables unless they were certain that this process had been strictly followed. Accordingly, in

Judaism, a task that, by secular or Christian standards seems mundane and unrelated to religious observance, actually carries great religious significance. In the absence of personal knowledge of and experience with Judaism, a jurist or state official could mistakenly conclude that this or a dozen other tasks or roles lack religious significance.

The absence of a robust and uniform application of the coreligionist exemption lands with outsized impact on minority or unfamiliar faith groups and threatens (i) the loss of their religious identity and autonomy; (ii) the imposition of coercive pressure on them to conform in belief and practice to prevailing secular definitions of roles; or (iii) a self-censoring alteration, limitation, or abandonment of aspects of a religious group's mission and religious practices.

## CONCLUSION

For the foregoing reasons, the Court should make clear in its opinion—regardless of which party prevails in this appeal—the importance of the coreligionist exemption and its protection of the right of religious groups to make religiously-informed decisions regarding which roles and activities within the organization should be limited to coreligionists.

Respectfully submitted,

s/ *Miles E. Coleman*

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
Miles E. Coleman
Adam B. McCoy
2 W. Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

Attorneys for *Amici Curiae*

### CERTIFICATE OF COMPLIANCE

In accordance with Rules 29(a)(5) and 32(g)(1), Fed. R. App. P., and Sixth Circuit Rule 32, I certify that this brief complies with the applicable type-volume limitations because this brief contains 5,701 words, including footnotes and excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b)(1). It complies with typeface requirements for Fed. R. App. P. 32(a)(5) and the Circuit Rules because it has been set in Century Schoolbook font in a size measuring 14 points.

Dated: November 20, 2023

s/ *Miles E. Coleman*
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2023, I electronically filed this Brief of *Amici Curiae* with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished electronically by the CM/ECF system.


Dated: November 20, 2023

s/ *Miles E. Coleman*
Attorney for *Amici Curiae*
