No. 23-1781

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

SACRED HEART OF JESUS PARISH, GRAND RAPIDS; JERRY HATLEY; ROBIN HATLEY; JOSEPH BOUTELL; RENEE BOUTELL; PETER UGOLINI; KATIE UGOLINI,

*Plaintiffs-Appellants,*

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan; JOHN E. JOHNSON, JR., in his official capacity as Executive Director of the Michigan Department of Civil Rights; et al.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:22-cv-01214

---

**Brief of Amici Curiae Association of Classical Christian Schools, American Association of Christian Schools, the Institute for Catholic Liberal Education, the Association for Biblical Higher Education, and the Wagner Faith & Freedom Center at Spring Arbor University in Support of Appellant and for Reversal**

---

Deborah J. Dewart
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554

Randall L. Wenger
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

*Attorneys for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1781          Case Name: Sacred Heart of Jesus v. Nessel

Name of counsel: Randall L. Wenger

Pursuant to 6th Cir. R. 26.1, Association of Classical Christian Schools, et al.
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____ November 22, 2023 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Randall L. Wenger

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.........................................i

TABLE OF AUTHORITIES.................................................................iii

INTEREST OF AMICI CURIAE...........................................................1

SUMMARY OF THE ARGUMENT.....................................................3

ARGUMENT......................................................................................5

I.    Ministerial Employees are the "Lifeblood" of a Religious
      Organization Because They are Critical to the
      Organization's Ability to Pursue its Mission and
      Disseminate its Message.......... ........................................5

      A. The Ministerial Exception Safeguards a *Trilogy* of Core
         First Amendment Rights – Speech, Association and
         Religion..................................................................6

      B. Every Religious Association is Entitled to Define its
         *Mission* and Select Representatives to Disseminate its
         *Message*.................................................................7

      C. A Religious School Speaks a *Message* Inextricably Linked
         to its *Mission*. The School Must Retain the Exclusive
         Right to Select the Messenger.......................................11

      D. A Religious Association Conveys its Message Not Only
         Through Speech, But Also the *Conduct* of its
         Representatives.........................................................13

      E. Every Association – Religious or Not – is Entitled to
         Select Those Who Will Disseminate its Unique Message
         and Fulfill its Mission................................................16

II.   Operating a Religious Organization in Accordance with that
      Organization's Religious Doctrine is Not Invidious,
      Irrational or Arbitrary Discrimination..................................18

A. This Case is the Natural Product of the United States Supreme Court's Decisions in *Obergefell* and *Bostock*…….........20

B. The Expansion of Anti-Discrimination Principles Has Accelerated the Potential for Collision with First Amendment Rights………………………………..……………...23

C. The Ministerial Exception Complements the Broad Coreligionist Doctrine, Based on Case Precedent and the Title VII Statutory Exemption from Religious Discrimination……………………………………..……..27

CONCLUSION………………………………………..……29

CERTIFICATE OF COMPLIANCE…………………..…….31

CERTIFICATE OF SERVICE…………………………………32

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023).....................22, 26, 27

*Bates v. City of Little Rock,* 361 U.S. 516 (1960) ......................................7

*Bd. of Ed. of Westside Community Schools (Dist. 66) v. Mergens,*
    496 U.S. 226 (1990)..........................................................................11, 12

*Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731 (2020)...........3, 20, 21, 22

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000)........................*passim*

*Braunfeld v. Brown*, 366 U.S. 599 (1961) .................................................18

*Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000)................8, 10, 17

*Capitol Square Review & Advisory Bd. v. Pinette,*
    515 U.S. 753 (1995).................................................................................11

*Corporation of the Presiding Bishop v. Amos,*
    483 U.S. 327 (1987).................................................................................28

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021)............................21

*Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown
    Univ.,* 536 A.2d 1 (D.C. 1987).............................................................25

*Healy v. James*, 408 U.S. 169 (1972).........................................................7

*Heffron v. International Soc. for Krishna Consciousness, Inc.,*
    452 U.S. 640 (1981)................................................................................12

*Hobbie v. Unemployment Appeals Comm'n of Florida,*
    480 U.S. 136 (1987).................................................................................20

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 U.S. 171 (2012).......................................................................*passim*

*Hsu v. Roslyn Union Free Sch. Dist. No. 3,*
    85 F.3d 839 (2d Cir. 1996)..................................................................10

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) ........................................................ 12, 22, 24

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1951) ................................................................ 23

*Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384 (1993) ................................................................ 11

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) ................................................................ 21

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ...................................................... 12

*McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) ...................... 5

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ................................................................ 12

*New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1 (1988) ................................................................ 11

*Obergefell v. Hodges*, 576 U.S. 644 (2015)...............................*passim*

*Our Lady of Guadalupe Sch.* v. *Morrissey-Berru*, 140 S. Ct. 2049 (2020) ............................................................ 10, 13, 14

*Petruska v. Gannon University*, 462 F.3d 294 (3d Cir. 2006)............. 9, 16

*Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985)........................................................ 9, 27

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988)................................................................ 12

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)........................................ 8, 9

*Rumsfeld v. Forum for Academic & Inst. Rights*, 547 U.S. 47 (2006) ................................................................ 9

*Spencer v. World Vision, Inc.*, 619 F.3d 1109 (9th Cir. 2010)................................................................ 28

*Thomas v. Review Bd. of Ind. Emp't,*
  450 U.S. 707 (1981)..............................................................................20

*United States v. United Foods, Inc.,*
  533 U.S. 405 (2001)..............................................................................12

*Washington v. Glucksberg,*
  521 U.S. 702 (1997)................................................................................6

*Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1872) ....................................16

*West Virginia State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943)..............................................................................22

*Widmar v. Vincent,* 454 U.S. 263 (1981) ...............................................12

*Wilson v. Cable News Network, Inc.,*
  444 P.3d 706 (Cal. 2019)......................................................................17

*Wooley v. Maynard*, 430 U.S. 705 (1977) ...............................................12

## Statutes

42 U.S.C. § 2000e-1 ..........................................................................27, 28

## Other Authorities

David E. Bernstein, *Defending the First Amendment From
  Antidiscrimination*, 82 N.C. L. Rev. 223 (2003)..................................24

Harlan Loeb and David Rosenberg, *Fundamental Rights in Conflict:
  The Price of a Maturing Democracy*, 77 N.D. L. Rev. 27 (2001)..........24

Ira C. Lupu, *Free Exercise Exemption and Religious Institutions:
  The Case of Employment Discrimination*,
  67 B.U. L. Rev. 391 (1987).........................................................5, 17, 18

Jack S. Vaitayanonta, Note: *In State Legislatures We Trust? The
  "Compelling Interest" Presumption and Religious Free Exercise
  Challenges to State Civil Rights Laws*,
  101 Colum. L. Rev. 886 (2001) .............................................................24

Michael W. McConnell, *"God is Dead and We have Killed Him!"*
  *Freedom of Religion in the Post-Modern Age*,
  1993 BYU L. Rev. 163 (1993) ....................................................... 25, 26

# INTEREST OF AMICI CURIAE[1]

Amici Curiae urge the Court to reverse the decision of the District Court.

Amici Curiae are the Association of Classical Christian Schools (ACCS), the American Association of Christian Schools (AACS), the Institute for Catholic Liberal Education (ICLE), the Association for Biblical Higher Education (ABHE), and the Wagner Faith & Freedom Center at Spring Arbor University. ACCS represents more than 500 classical Christian schools, typically K-12, although many have preschools. These schools practice classical education based on the seven liberal arts in a Christian setting and from a Christian worldview. AACS, a federation of 38 state and regional Christian school associations, serves over 118,000 students and teachers in its member schools throughout the United States. ICLE is a national Catholic School organization providing formation to teachers, principals and pastors in their effort to renew their schools in the Catholic intellectual and cultural tradition as found in

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or any person other than amicus curiae or their counsel contributed money intended to fund preparation or submission of this brief. This brief is accompanied by a Motion for Leave to File.

more than a millennia of writings, systems and practice. ICLE serves more than 350 schools and has a membership of 229 Catholic schools representing approximately 45,000 students, including Sacred Heart Academy. ABHE comprises more than 150 institutions of biblical higher education, committed to challenging its more than 68,000 students to think critically as they form a biblically grounded Christian worldview. Housed on the campus of Spring Arbor University (SAU), the Wagner Faith & Freedom Center works to ensure the next generation may educate their children free of persecution. For 150 years SAU educated generations of Michiganders with a total commitment to Jesus Christ as the perspective for learning, preparing them for critical participation in a contemporary world.

Amici care deeply about the ministerial exception because the existence of a strong ministerial exception helps to safeguard the essential character and mission of Amici's members and those for which they advocate. Amici are increasingly experiencing the conflict between the prevailing culture and schools' teachings on human sexuality, marriage and gender. A strong ministerial exception preserves schools' ability to hire teaching staff that will teach full-orbed biblical

understanding of the world. A weak ministerial exception jeopardizes the unique religious contributions of these institutions. Amici's experience will aid this Court's understanding of what is at stake.

## SUMMARY OF THE ARGUMENT

Plaintiff-Appellant Sacred Heart of Jesus Parish, Grand Rapids operates Sacred Heart Academy (Sacred Heart) as an apostolate (or "ministry"). As an apostolate of Sacred Heart of Jesus Parish, Sacred Heart exists to support parents who desire to provide a Christ-centered education for their children. Sacred Heart promotes a culture that is intentional in transmitting the Catholic faith and its doctrine through both teaching and practice. Plaintiffs-Appellants Jerry and Robin Hatley, Joseph and Renee Boutell and Peter and Katie Ugolini are all parents of children who attend Sacred Heart.

This case follows a growing trend of challenges to religious practices using anti-discrimination laws aimed at sexual orientation and gender identity. That trend is unremarkable considering the United States Supreme Court's opinions in *Obergefell v. Hodges*, 576 U.S. 644 (2015), and *Bostock v. Clayton County, Ga.*, 140 S. Ct. 1731 (2020).

Religious faith is not an isolated compartment of life, but a broad worldview that intersects every square inch in the lives of adherents and the organizations they operate. The promise of liberty requires broad religious protections, including the ministerial exception, in order to protect religious believers and their institutions. All Americans benefit when we enable the ordering of our lives around those principles most important to us without fear of backlash.

Unless this Circuit Court steps in to provide meaningful First Amendment protection, Michigan will continue to prevent faith-based organizations from hiring those who share their religious beliefs about marriage and sexuality – beliefs that the Supreme Court has declared "decent and honorable." *Obergefell*, 576 U.S. at 672. The end result of laws like those in Michigan is clear – religious organizations will be forced to choose between their religious mission and continuing to operate. We will all suffer the consequences when we shut down religious organizations and lose their unique contributions and service to our communities.

# ARGUMENT

I. **Ministerial Employees are the "Lifeblood" of a Religious Organization Because They are Critical to the Organization's Ability to Pursue its Mission and Disseminate its Message**.

The ministerial exception enables a religious organization to preserve its core identity and perpetuate its existence by freely choosing those who will speak for it and carry out its mission. Associational autonomy is critical to this task. Ira C. Lupu, *Free Exercise Exemption and Religious Institutions: The Case of Employment Discrimination*, 67 B.U. L. REV. 391, 436 (1987). As the Fifth Circuit explained, ministerial employees are the "lifeblood" of a religious organization, the "chief instrument by which the [organization] seeks to fulfill its purpose." *McClure v. Salvation Army*, 460 F.2d 553, 558-559 (5th Cir. 1972). An employee's function and primary duties reveal whether that person is part of the "lifeblood" that flows through an institution's veins as it pursues its mission and disseminates its message. Teachers are the quintessential "lifeblood" of a religious school. Recognizing this vital role of its teachers and other employees, Sacred Heart requires its employees to believe, support and model the Catholic faith. Conversely, its employees are required to avoid all beliefs and practices that are

5

inconsistent with the moral teachings of the Church. These expectations and requirements are reflected throughout Sacred Heart's job postings, job descriptions and their employment documents. The integration of the Catholic faith and community in all areas of life and learning is foundational to Sacred Heart's mission. If Sacred Heart is barred from hiring teachers and other employees who will teach and model the beliefs that are core to its existence, the ministry cannot carry out its religious mission.

### A.    The Ministerial Exception Safeguards a *Trilogy* of Core First Amendment Rights — Speech, Association and Religion.

Speech, association and religion are all "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," so that "neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg,* 521 U.S. 702, 721 (1997) (cleaned up). These intertwined rights would be fundamental even if not explicitly stated in the First Amendment.

Without the robust protection long recognized by the United States Supreme Court, Sacred Heart would have to forfeit all three rights. These basic liberties "are protected not only against heavy-handed frontal

6

attack, but also from being stifled by *more subtle governmental interference.*" *Healy v. James*, 408 U.S. 169, 183 (1972), *quoting Bates v. City of Little Rock,* 361 U.S. 516, 523 (1960) (emphasis added). Here, Michigan wields anti-discrimination laws as a sword to those religious beliefs that are at odds with its stance on the sensitive topics of gender identity and sexuality. Such topics, from time out of mind, have been understood and encompassed within the context of most religious creeds and doctrines. Yet, Michigan, through its public accommodations and employment laws, now denies ministries their ability to exist and function according to their beliefs. By preventing Sacred Heart from forming a cohesive association with persons who will faithfully transmit its message, Michigan's laws deprive Sacred Heart of its First Amendment liberties and longstanding protection for religious hiring.

**B.    Every Religious Association is Entitled to Define its *Mission* and Select Representatives to Disseminate its *Message*.**

The themes of *mission* and *message* emerge before and after *Hosanna-Tabor* in the Supreme Court's expressive association jurisprudence. "The right to freedom of association is a right enjoyed by religious and secular groups alike." *Hosanna-Tabor Evangelical*

7

*Lutheran Church & School v. EEOC*, 565 U.S. 171, 189 (2012). Any expressive association may create a voice that will faithfully communicate its message and carry out its mission. Whether religious or secular, "[f]orcing a group to accept certain members may impair [its ability] to express those views, and only those views, that it intends to express." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

Plaintiffs-Appellants Jerry and Robin Hatley, Joseph and Renee Boutell and Peter and Katie Ugolini are parents who have carefully and selectively chosen a Sacred Heart education for their children. These parents believe that a strong Catholic foundation and faith environment is essential to their children's academic, moral and spiritual development. The freedom of these parents to associate with a school that aligns with and teaches their faith and values is a freedom guaranteed by the First Amendment. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (the First Amendment protects the freedom to join together in furtherance of common beliefs).

An association of individuals can only speak through its authorized representatives. An expressive association is "the creation of a voice, and the selection of members is the definition of that voice." *Roberts v. U.S.*

*Jaycees*, 468 U.S. 609, 643 (1984) (O'Connor, J., concurring). Speech is amplified when many voices combine. Government restrictions on expressive association can have a chilling effect on protected speech. *Rumsfeld v. Forum for Academic & Inst. Rights*, 547 U.S. 47, 68 (2006); *Jaycees,* 468 U.S. at 622.

Religious organizations are "the archetype of associations formed for expressive purposes, and their fundamental rights surely include the freedom to choose who is qualified to serve as a voice for their faith." *Hosanna-Tabor*, 565 U.S. at 200-201 (Alito, J., concurring). Religious organizations are "dedicated to the collective expression and propagation of shared religious ideals." *Id*. at 200. The free exercise of religion requires that an organization "must retain the corollary right to select its voice." *Petruska v. Gannon University*, 462 F.3d 294, 306 (3d Cir. 2006). The continued existence and identity of a religious association hinges on the persons "select[ed] to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985). This is true for churches, schools and other religious associations.

Religious schools exist for the "religious education and formation of students," and accordingly, "the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." *Our Lady of Guadalupe Sch.* v. *Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020) ("*OLG*"). This selection process is a critical component of a religious organization's "autonomy with respect to internal management." *Id.* at 2060. A school's ability to select its teachers is imperative to preserving its identity. Teachers shape the content and quality of the school's speech. If they are not committed to the school's religious values, the group's voice will be garbled. *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 857 (2d Cir. 1996).

The freedom to associate presupposes the freedom to *not* associate as well as

> the freedom to identify the people who constitute the association, and to limit the association to those people only. . . . Freedom of association would prove an empty guarantee if associations could not limit control over their decision to those who share the interests and persuasions that underlie the association's being.

*Cal. Democratic Party,* 530 U.S. at 574 (cleaned up).

An organization's ability to speak is severely curtailed if it is denied the right to identify the persons who speak for it. This limited right to

"discriminate" enables an expressive association to create its distinctive voice, and that encompasses the corollary right to determine who does *not* represent and speak for it.

Sacred Heart, like any organization committed to the transmission of a system of values, is engaged in constitutionally protected expression. *Dale*, 530 U.S. at 650. That expression is threatened if the school is compelled to accept a teacher whose presence may imperil its ability to promote a particular viewpoint. *Id*. at 648; *New York State Club Assn., Inc. v. City of New York,* 487 U.S. 1, 13 (1988).

## C. A Religious School Speaks a *Message* Inextricably Linked to its *Mission*. The School Must Retain the Exclusive Right to Select the Messenger.

Communication is critical to any association's ability to fulfill its mission. Religious speech,

> far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression . . . government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince.

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). *See also Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384 (1993); *Bd. of Ed. of Westside Community Schools*

11

*(Dist. 66) v. Mergens,* 496 U.S. 226 (1990); *Widmar v. Vincent,* 454 U.S. 263 (1981); *Heffron v. International Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640 (1981). Regardless of motives, the state "may not substitute its judgment as to how best to speak" for that of an organization. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 791 (1988); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (crisis pregnancy centers protected against compelled speech regarding state-financed abortions). Compelling an organization to retain an unwanted ministerial employee (or pay a hefty fine) is tantamount to compelled speech. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 717 (1977); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995). Even a secular business may create a unique brand to convey a message to the public – and do so free of government compulsion. *See, e.g., Matal v. Tam*, 137 S. Ct. 1744, 1760 (2017) (trademark); *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (mushroom producer).

The free speech principles at stake here were evident in *Hosanna-Tabor,* 565 U.S. at 192. The plaintiff teacher had a role in "conveying the Church's message and carrying out its mission." *Id*. at 204. (Alito, J.,

concurring). In *OLG*, similarly, the teachers were "entrusted most directly with the responsibility of educating their students in the faith." *OLG*, 140 S. Ct. at 2066. The ministerial exception "should be tailored to this purpose" and applied to any employee who "serves as a messenger or teacher of its faith." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). Considering the critical role of those who speak for a religious association, "[t]he Constitution leaves it to the collective conscience of each religious group to determine for itself who is qualified to serve as a teacher or messenger of its faith." *Id.* at 202.

### D.    A Religious Association Conveys its Message Not Only Through Speech, But Also the *Conduct* of its Representatives.

Religion is a comprehensive worldview, not a compartment detached from daily life. Religious school representatives not only speak *about* religion—they model its values in their interactions with students, faculty and others. A religious school must consider the students it serves and respond to their expectations and needs. In *OLG*, as in *Hosanna-Tabor*, the Supreme Court recognized that "educating young people in their faith, inculcating its teachings, and *training them to live their faith* . . . lie at the *very core* of the mission of a private religious school." *OLG*,

13

140 S. Ct. at 2064 (emphasis added). Indeed, this is "what an employee does." *Id*.

Sacred Heart recognizes that it cannot fulfill its religious mission unless its teachers and other employees believe, model and support the tenets of the Catholic faith. From the very first point of advertising positions for which it is hiring, Sacred Heart's job postings include an introductory statement that describes employees, including "clerics, religious and lay people," as "chosen collaborators" who "share in the apostolic mission" of the Parish and Academy. Previous Job Postings, R. 1-6, Page ID ##122,125 and Current Job Postings, R. 1-10, page ID ## 144, 147. This introductory paragraph ends by stating that "[e]ach employee helps to extend the ministry of the local Pastor in particular ways as outlined in [the] position description." *Id*. These job postings further specify that any eligible candidate must be a "practicing Catholic whose public life is lived in conformity with the moral teachings of the Church." Previous Job Postings, R. 1-6, Page ID ##123, 126 and Current Job Postings, R. 1-10, page ID ## 145, 148. For the teaching positions, the essential duties and responsibilities of the position include the requirement of "[i]ntegrating Jesus Christ, the life of the Church and the

organic unity of the Catholic faith into the curriculum and classroom environment." Previous Job Postings, R. 1-6, Page ID #122 and Current Job Postings, R. 1-10, page ID #144. *See also* R. 1-10, Page ID #147.

Upon hiring, each employee of Sacred Heart is required to enter into a written Memorandum of Understanding that includes a comprehensive Standard of Conduct. As part of the Standard of Conduct, the employee agrees, as a condition of employment, that "[he]/she must be consistent, in expression and example, with the teaching and practice of the Catholic faith and shall not advocate, encourage, or counsel beliefs or practices that are inconsistent with the Catholic faith." Faculty Memorandum of Understanding, R. 1-4, Page ID #115. In addition to this written affirmation, employees must publicly recite the "Oath of Fidelity on Assuming an Office To Be Exercised in the Name of the Church." Faculty Memorandum of Understanding, R. 1-4, Page ID #115. In reciting this Oath, employees promise that they, "in [their] words and . . . actions," will "hold fast to the deposit of faith in its entirety" and "avoid any teachings contrary" to the faith. *Id.* at Page ID ##117-118. What is clear through all these employee documents is that each employee's

sincere commitment to the Catholic faith is of paramount importance to the mission of Sacred Heart.

A religious organization may require conformity to its moral standards as a condition of membership. *Watson v. Jones,* 80 U.S. (13 Wall.) 679 (1872). Criteria for leaders, who speak for the organization, is even more critical and may not be dictated by government.

> When it comes to the expression and inculcation of religious doctrine, there can be no doubt that the messenger matters. . . . [B]oth the content and credibility of a religion's message depend vitally on the character and conduct of its teachers. A religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses.

*Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring). Teachers not only convey the school's religious message—they are "the embodiment" of that message. *Petruska,* 462 F.3d at 306.

### E. Every Association — Religious or Not — is Entitled to Select Those Who Will Disseminate its Unique Message and Fulfill its Mission.

A broad view of the Supreme Court's expressive association jurisprudence is critical to this case. "The right to freedom of association is a right enjoyed by religious and secular groups alike." *Hosanna-Tabor*,

565 U.S. at 189. Every expressive association is entitled to craft a voice that will faithfully communicate its message and carry out its mission.

"[A]n entity can act and speak only through the individuals that comprise and represent it." *Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 720 (Cal. 2019). Speech is often most effective when many voices are combined. Employees speak for an organization through their spoken words and conduct. If they are not committed to the association's mission and message, they are more likely to misrepresent or weaken both the mission and the message. Over time, the association's fundamental identity may be distorted beyond recognition.

Michigan's employment nondiscrimination laws not only impact Sacred Heart and other religious organizations, they also stifle the freedom of non-religious groups to associate with, and disseminate a clear message through, their chosen representatives. There is no substitute for a group's right to select its members and leaders. *Cal. Democratic Party*, 530 U.S. at 581. Regulating the identity of a political party's leaders interferes with the content and promotion of its message. *Id.* at 579. Similarly, associational autonomy is critical to a religious organization's preserving its identity. Ira C. Lupu, *Free Exercise Exemption and*

17

*Religious Institutions: The Case of Employment Discrimination*, 67 B.U. L. REV. 391, 436 (1987). A religious institution may not be forced to say "anything in conflict with [its] religious tenets." *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961). Government regulation has the potential to "alter both content and the mode of expression of its shared commitments over time." Lupu, *Free Exercise Exemption*, 67 B.U. L. REV. at 434.

Without the ability to select those messengers who will represent it and speak on its behalf, an organization loses control of its message. It is this limited right to "discriminate" in its expressive association that enables an organization to ensure that its unique message remains consistent with its mission. This case exemplifies that right. Sacred Heart must be free to decline to hire or retain an individual who disagrees with or opposes its religious message. That is the only way it can preserve and carry out its unique mission.

## II. Operating a Religious Organization in Accordance with that Organization's Religious Doctrine is Not Invidious, Irrational or Arbitrary Discrimination.

Michigan's use of its employment nondiscrimination laws to punish religious schools and organizations for hiring those who share their religious beliefs is a complete denial of these organizations' right to

18

operate in accordance with their religious doctrine. Moreover, these laws force ministries such as Sacred Heart to speak views, restrict their speech and take actions that directly violate their faith. By placing a *statutory* right on equal footing with a *constitutional* right, Michigan now wields its authority against religious organizations that act consistently with beliefs about important issues on which members of a free society may reasonably disagree.

The action of a *religious* organization, motivated by its *religious* doctrine, is not arbitrary, irrational, unreasonable or invidious. Indeed, Sacred Heart's selection of employees who support its religious mission is not "discrimination" at all. *See Obergefell*, 576 U.S. at 679-80 ("The First Amendment ensures that religious organizations . . . are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered."). This is not a case where the law may proscribe refusal to conduct business with an entire group based on personal animosity or *irrelevant* criteria. It is *relevant* for a religious school to consider a teacher's agreement (or disagreement) with its religious doctrine and mission. A court's refusal

to consider religious motivation and relevance—and distinguish that from invidious discrimination—"tends to exhibit hostility, not neutrality, towards religion." *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 142 n.7 (1987); *See also Thomas v. Review Bd. of Ind. Emp't*, 450 U.S. 707, 708 (1981).

Religious employers' pursuit of employees that share their mission is not invidious but indispensable to maintaining the character of an organization. A religious employer should be free to hire those who both believe what the organization believes and who seek to live consistently with those beliefs. Human sexuality is inseparable from most religious doctrinal belief systems and expectations as to conduct within those belief systems. Recognition of a broad ministerial exception is essential to religious freedom, freedom of speech and association. Without it, religious groups cannot adhere to those teachings that are core to their religion.

### A. This Case is the Natural Product of the United States Supreme Court's Decisions in *Obergefell* and *Bostock*.

There has been an alarming surge in the use of anti-discrimination laws to compel uniformity of thought and action about sexual mores, contrary to *Obergefell*'s admonition that religious organizations and

persons should be free to organize their lives around these issues. This is hardly a shocking development. Indeed, it is the foreseeable result of the Supreme Court's rulings in *Obergefell*, 576 U.S. 644, and *Bostock*, 140 S. Ct. 1731. The Court put its thumb on the scale on issues of profound cultural and religious significance but failed to lift a finger to relieve the burdens it had inadvertently created. *Obergefell*, 576 U.S. at 711 (Roberts, C.J., dissenting) ("[f]ederal courts . . . do not have the flexibility of legislatures to address concerns of parties not before the court"). Justice Thomas warned of "potentially ruinous consequences for religious liberty." *Id*. at 734 (Thomas, J., dissenting). Unfortunately, the Court's promises to preserve religious liberty, *id*. at 679-680, ring hollow in this case.

Subsequent decisions have served to clarify and preserve First Amendment liberties in the face of government wielding its anti-discrimination punitive authority. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018), provided protection against open government hostility to religion. In *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), the Supreme Court ruled that the City violated the Free Exercise rights of a foster care agency by refusing to contract

with the ministry because of its stance against placing foster children with same-sex couples. More recently, in *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023), the Supreme Court considered the impact of Colorado's sweeping public accommodations law on a website designer's free speech. Reviewing its rulings in *Hurley*, 515 U.S. 557, and *Dale*, 530 U.S. 640, the Court concluded, "in both cases this Court held that the State could not use its public accommodations statute to deny speakers the right to choose the content of their own messages." *303 Creative,* 143 S. Ct. at 2315 (cleaned up).

Despite the clarifications from these cases, misinterpretations of *Obergefell* and *Bostock* continue to result in brazen efforts to coerce uniformity of thought about the nature of marriage and sexuality, redefining basic biology and concepts that have stood for millennia. Attempts to compel uniform thought are dangerous to a free society where the government must respect a wide range of diverse viewpoints. In the past, "[s]truggles to coerce uniformity . . . have been waged by many good as well as by evil men." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 640 (1943). These efforts are ultimately futile. "Compulsory unification of opinion achieves only the unanimity of the

graveyard." *Id*. at 641. Religious organizations and individuals are especially threatened by laws and policies that prohibit "discrimination" based on sexual orientation and/or gender identity. Strong convictions about marriage and sexuality often characterize a system of religious doctrine. Sacred Heart holds religious beliefs about marriage and sexuality that are baked into the religious worldview that undergirds its mission, message and choice of messengers. The Constitution guarantees Sacred Heart and other religious organizations "independence from secular control or manipulation" in matters of "faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1951). Michigan's employment anti-discrimination laws crush that independence and are openly hostile toward religious schools and organizations.

**B.     The Expansion of Anti-Discrimination Principles Has Accelerated the Potential for Collision with First Amendment Rights.**

Anti-discrimination policies have roots in the distant past. "State public accommodations laws were originally enacted to prevent discrimination in traditional places of public accommodation—like inns and trains." *Dale*, 530 U.S. at 656. The Massachusetts law at issue in

*Hurley* grew out of the common law principle that innkeepers and others in public service could not refuse service to a customer without good reason. *Hurley*, 515 U.S. at 571.

Modern anti-discrimination principles have expanded over the years. The traditional "places" have moved beyond inns and trains to commercial entities and even membership associations, increasing the potential for collision with First Amendment rights. *Dale*, 530 U.S. at 656. Anti-discrimination rights, whether created by statute or derived from equal protection principles, may conflict with core rights to religious liberty. Harlan Loeb and David Rosenberg, *Fundamental Rights in Conflict: The Price of a Maturing Democracy*, 77 N.D. L. REV. 27, 29 (2001). Commentators have observed the complex legal questions that arise where statutory protections clash with the free exercise of religion. Jack S. Vaitayanonta, Note: *In State Legislatures We Trust? The "Compelling Interest" Presumption and Religious Free Exercise Challenges to State Civil Rights Laws*, 101 COLUM. L. REV. 886, 887 (2001); *See also* David E. Bernstein, *Defending the First Amendment From Antidiscrimination*, 82 N.C. L. REV. 223 (2003) (urging resolution in favor of First Amendment liberties).

24

The clash between anti-discrimination principles and the First Amendment is particularly volatile when a practice of religious significance is encompassed in legislation and religious persons or groups are swept within the ambit of the new law. Government ought not legislate a particular view of sexual morality and compel religious institutions and individuals to facilitate it. When the D.C. Circuit addressed the question "of imposing official orthodoxy on controversial issues of religious, moral, ethical and philosophical importance, upon an entity whose role is to inquire into such matters" it concluded that "[t]he First Amendment not only ensures that questions on difficult social topics will be asked, it also *forbids government from dictating the answers*." *Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.,* 536 A.2d 1, 24 n.19 (D.C. 1987) (emphasis added). Religious voices have shaped views of sexual morality for centuries. These deeply religious convictions shape the way people of faith live their daily lives, privately and in public. Advocates of social change with respect to sexuality tend to be "anything but indifferent toward the teachings of traditional religion—and since they are not indifferent they are not tolerant." Michael W. McConnell, *"God is Dead and We have*

*Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. REV. 163, 187 (1993). Political power can be used to squeeze religious views out of public debate about controversial social issues, as cases like this one demonstrate.

The Supreme Court, in *303 Creative*, 143 S. Ct. 2298, has articulated what the outcome must be when laws like the ones at issue here collide with First Amendment rights: "When a state public accommodations law and the Constitution collide, there can be no question which must prevail." *Id*. at 2315. Leaving no doubt on how this collision must be resolved, the Court concluded:

> In this case, Colorado seeks to force an individual to speak in ways that align with its views but defy her conscience about a matter of major significance. In the past, other States in *Barnette*, *Hurley*, and *Dale* have similarly tested the First Amendment's boundaries by seeking to compel speech they thought vital at the time. But, as this Court has long held, the opportunity to think for ourselves and to express those thoughts freely is among our most cherished liberties and part of what keeps our Republic strong. Of course, abiding the Constitution's commitment to the freedom of speech means all of us will encounter ideas we consider "unattractive," "misguided, or even hurtful." But tolerance, not coercion, is our Nation's answer. The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands.

*303 Creative*, 143 S. Ct. at 2321-2322.

As anti-discrimination employment laws continue to collide with First Amendment rights, a clear ruling is needed in this Circuit to preserve the liberty of religious schools and organizations, which is in imminent jeopardy. Unless this Court intervenes to restore the free-speech, expressive association and religious liberty of Sacred Heart and other religious organizations, this ministry and others like it will lose their religious identity and their ability to pursue their religious mission.

C.    **The Ministerial Exception Complements the Broad Coreligionist Doctrine, Based on Case Precedent and the Title VII Statutory Exemption from Religious Discrimination**.

There is unquestionably tension between "our cardinal Constitutional principles of freedom of religion . . . and our national attempt to eradicate all forms of discrimination." *Rayburn*, 772 F.2d at 1167. However, a religious organization must be free to exclude non-adherents from employment positions where they could distort the organization's message or hinder its mission.

Recognizing the unique constitutional protection for religion, the Civil Rights Act of 1964 (Title VII) accommodates religious employers by exempting them from the prohibition against religious discrimination. 42

U.S.C. § 2000e-1. The Supreme Court upheld the exemption against Establishment and Equal Protection Clause challenges, observing that government should not interfere with "the ability of religious organizations to define and carry out their religious missions." *Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327, 335-336 (1987) (building engineer discharged by nonprofit gymnasium associated with church). This broad exemption allows a religious employer to terminate an employee "for exclusively religious reasons," even "*without respect to the nature of their duties*." *Spencer v. World Vision, Inc.*, 619 F.3d 1109, 1111 n.4 (9th Cir. 2010) (emphasis added). In *Spencer*, the Ninth Circuit upheld World Vision's termination of three employees who performed maintenance, office and shipping services. All of them initially signed the required "Statement of Faith, Core Values, and Mission Statement" but later were terminated when they renounced the religious doctrine that defines World Vision's mission. *Id*. at 1112.

The constitutionally compelled ministerial exception, based on an *employee's* ministerial status, complements the broad protection grounded in an *employer's* religious nature. Both guard free exercise rights. If otherwise applicable anti-discrimination laws were applied to

28

religious entities without some adjustment for their religious character and purposes, there would be an enormous collision with religious liberty, free speech and association. Religious entities have broad liberty to "discriminate" based on religious doctrine. Although other anti-discrimination provisions may sometimes apply, the ministerial exception ensures that government does not encroach on a religious organization's liberty to select those employees who are most critical to fulfilling its *religious* mission.

## CONCLUSION

Because of the important First Amendment considerations underpinning the ministerial exception and coreligionist doctrine, Amici respectfully request that this Court reverse the District Court and grant Sacred Heart's motion for preliminary injunction.

Respectfully submitted,

/s/ Randall L. Wenger

Randall L. Wenger
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

Deborah J. Dewart
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5). This brief contains 5,674 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in fourteen (14) point Century Schoolbook font.

/s/ Randall L. Wenger

Randall L. Wenger
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

Deborah J. Dewart
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554

*Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of November, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

<u>/s/ Randall L. Wenger, Esq.</u>

Randall L. Wenger
Independence Law Center
23 N. Front St., First Fl
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org