No. 23-1781

---

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

SACRED HEART OF JESUS PARISH, GRAND RAPIDS; JERRY HATLEY; ROBIN
HATLEY; JOSEPH BOUTELL; RENEE BOUTELL; PETER UGOLINI; KATIE
UGOLINI,

*Plaintiffs-Appellants,*

v.

DANA NESSEL, in her official capacity as Attorney General of Michigan;
JOHN E. JOHNSON, JR., in his official capacity as Executive Director of
the Michigan Department of Civil Rights; et al.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:22-cv-01214

---

**REPLY BRIEF OF APPELLANTS**

---

Cody S. Barnett
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

David A. Cortman
Ryan J. Tucker
Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
dcortman@ADFlegal.org
rtucker@ADFlegal.org
kanderson@ADFlegal.org

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of Authorities..................................................................................ii

Summary of the Reply...........................................................................1

Argument.................................................................................................3

I.   Michigan's brief bolsters Sacred Heart's credible fears that the State will enforce its laws against the school. ..........................3

    A.   Michigan admits that its laws apply to Sacred Heart and never disputes the school's understanding of how those laws apply. ......................................................................3

    B.   Michigan did not dispel the presumption that it would enforce its laws against Sacred Heart. ...................................6

    C.   Even though Michigan rigidly misconstrues this Court's caselaw, Sacred Heart satisfies all that this Court has ever required for pre-enforcement standing. ......11

II.  Sacred Heart will suffer an ongoing hardship absent review now, and its claims are ripe. ........................................................15

III. Michigan's invocation of hypothetical exemptions do not defeat standing or make this case unripe.....................................18

    A.   Fleeting savings clauses do not alleviate the credible threat Sacred Heart faces. ..................................................18

    B.   Michigan's cursory invocation of the BFOQ process does not defeat standing or make this case unripe. ............22

IV.  Sacred Heart deserves a preliminary injunction because it meets all the required factors. ......................................................24

Conclusion ............................................................................................26

Certificate of Compliance....................................................................27

Certificate of Service ...........................................................................28

# TABLE OF AUTHORITIES

## Cases

*281 Care Committee v. Arneson,*
  638 F.3d 621 (8th Cir. 2011) .........................................................13

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ..............................................................17, 23

*Assemany v. Archdiocese of Detroit,*
  434 N.W.2d 233 (Mich. Ct. App. 1988) .........................................30

*Babbitt v. United Farm Workers National Union,*
  442 U.S. 289 (1979) ...................................................15, 17, 19, 30

*Bays v. City of Fairborn,*
  668 F.3d 814 (6th Cir. 2012) ........................................................32

*Benalcazar v. Genoa Township,*
  1 F.4th 421 (6th Cir. 2021).........................................................26

*Block v. Canepa,*
  74 F.4th 400 (6th Cir. 2023)..................................................19, 21

*Braidwood Management, Inc. v. EEOC,*
  70 F.4th 914 (5th Cir. 2023).......................................................17

*Brown v. Kemp,*
  86 F.4th 745 (7th Cir. 2023).......................................................28

*CHKRS, LLC v. City of Dublin,*
  984 F.3d 483 (6th Cir. 2021) .......................................................26

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ....................................................................30

*Doe v. Sundquist,*
  106 F.3d 702 (6th Cir. 1997) .......................................................32

*Dombrowski v. Pfister,*
  380 U.S. 479 (1965) ....................................................................27

*FEC v. Cruz,*
    596 U.S. 289 (2022) ............................................................ 23, 30

*Fischer v. Thomas,*
    52 F.4th 303 (6th Cir. 2022) .................................................. 18, 31

*Green Party of Tennessee v. Hargett,*
    791 F.3d 684 (6th Cir. 2015) ............................................ 14, 16, 27

*Harris v. Klare,*
    902 F.3d 630 (6th Cir. 2018) ....................................................... 32

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ................................................................ 17, 26

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ..................................................................... 32

*In re Allied Supermarkets, Inc.,*
    951 F.2d 718 (6th Cir. 1991) ....................................................... 32

*Initiative & Referendum Institute v. Walker,*
    450 F.3d 1082 (10th Cir. 2006) ................................................... 27

*Isaacson v. Mayes,*
    84 F.4th 1089 (9th Cir. 2023) ...................................................... 20

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) .................................................. 11, 13

*Konigsberg v. State Bar of California,*
    366 U.S. 36 (1961) ....................................................................... 28

*McKay v. Federspiel,*
    823 F.3d 862 (6th Cir. 2016) ....................................................... 18

*McLeod v. Providence Christian School,*
    408 N.W. 2d 146 (Mich. Ct. App. 1987) ...................................... 30

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007) ..................................................................... 15

*National Federation of Independent Business v. Sebelius*,
 567 U.S. 519 (2012) ........................................................ 15

*National Rifle Association of America v. Magaw*,
 132 F.3d 272 (6th Cir. 1997) ......................................... 13

*Online Merchants Guild v. Cameron*,
 995 F.3d 540 (6th Cir. 2021) ............................. 18, 21, 22

*Our Lady of Guadalupe School v. Morrissey-Berru*,
 140 S. Ct. 2049 (2020) .................................................. 30

*Peoples Rights Organization, Inc. v. City of Columbus*,
 152 F.3d 522 (6th Cir. 1998) ......................................... 27

*Picard v. Magliano*,
 42 F.4th 89 (2d Cir. 2022) ............................................ 12

*Pinney Dock & Transportation Company v. Penn Central Corp.*,
 838 F.2d 1445 (6th Cir. 1988) ....................................... 32

*Platt v. Board of Commissioners on Grievances & Discipline of Ohio
 Supreme Court*,
 769 F.3d 447 (6th Cir. 2014) ......................................... 13

*Porth v. Roman Catholic Diocese of Kalamazoo*,
 532 N.W.2d 195 (Mich. Ct. App. 1995) ......................... 30

*Regional Rail Reorganization Act Cases*,
 419 U.S. 102 (1974) ...................................................... 23

*Sisters for Life, Inc. v. Louisville-Jefferson County*,
 56 F.4th 400 (6th Cir. 2022) .......................................... 25

*Speech First, Inc. v. Schlissel*,
 939 F.3d 756 (6th Cir. 2019) ................................... 14, 19

*Steffel v. Thompson*,
 415 U.S. 452 (1974) .......................................... 15, 27, 31

*Stilwell v. Office of Thrift Supervision*,
 569 F.3d 514 (D.C. Cir. 2009) ....................................... 14

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ............................................................ 11, 12

*Telescope Media Group. v. Lucero*,
936 F.3d 740 (8th Cir. 2019) ........................................... 17

*Terrace v. Thompson*,
263 U.S. 197 (1923) ........................................................ 15

*Thomas More Law Center v. Obama*,
651 F.3d 529 (6th Cir. 2011) ........................................... 15

*United States v. Stevens*,
559 U.S. 460 (2010) .................................................... 8, 28

*Universal Life Church Monastery Storehouse v. Nabors*,
35 F.4th 1021 (6th Cir. 2022)......................................... 16

*Vidrich v. Vic Tanny International, Inc.*,
301 N.W.2d 482 (Mich. Ct. App. 1980) ......................... 11

*Virginia v. American Booksellers Association, Inc.*,
484 U.S. 383 (1988) ........................................................ 15

*Weishuhn v. Catholic Diocese of Lansing*,
756 N.W.2d 483 (Mich. Ct. App. 2008) ......................... 30

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943) ........................................................ 28

## Statutes

MCL 750.146 .......................................................................... 11

## Other Authorities

The Federalist No. 51 (J. Madison)............................................ 8

## Regulations

3 Colo. Code Regs. 708-1:10.14(C)............................................ 17

## Constitutional Provisions

U.S. Const. art. VI, para. 2....................................................... 21

## SUMMARY OF THE REPLY

As our Founders recognized, we are governed not by angels but by fallible men. The Federalist No. 51 (J. Madison). Even well-meaning officials make mistakes. They misinterpret the law—sometimes even intentionally. That's why courts do "not uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly"—especially when First Amendment freedoms hang in the balance. *United States v. Stevens*, 559 U.S. 460, 480 (2010).

Michigan asks this Court to flip the presumption—to dismiss the pre-enforcement challenge that Sacred Heart and Parents Jerry and Robin Hatley, Joseph and Renee Boutell, and Peter and Katie Ugolini brought against laws that threaten their First Amendment liberties and parental rights. And all because the State promises to *consider* the First Amendment after enforcement. According to Michigan, Sacred Heart does not have standing and its case is not ripe because the Elliot-Larsen Civil Rights Act (the Act) and the Equal Accommodations Act "do not proscribe activity otherwise protected by the First Amendment." Resp. Br. 19. Of course, Michigan never concedes that Sacred Heart's activities are *actually* "protected by the First Amendment," and coyly dances around the issue throughout its brief. That's because the State wants to keep its enforcement options open. Michigan candidly desires to "weigh[ ]" Sacred Heart's activities against its own governmental interests. *Id.* at 23. It's no secret what outcome Michigan will reach.

If hollow assurances from a state were enough to defeat justiciability, pre-enforcement challenges would never get litigated on the merits. After all, *no* law may proscribe activity the First Amendment protects. The question here is whether that protection safeguards Sacred Heart's freedom to use pronouns, separate sports teams and restrooms based on sex, publish certain statements, and make employment choices consistent with its faith. That's a *merits* question, not a *standing* or *ripeness* one.

Sacred Heart has every reason to fear that Michigan will enforce its laws against the school. Michigan admits that its laws are "broad," that they apply to Sacred Heart, and that its interest in enforcing those laws is "paramount." Resp. Br. 20, 33, 56. Michigan never disagrees with how Sacred Heart interprets these laws, how these laws apply to the school's activities, or how similar laws are applied across the country. Courts have found credible threats based on much less.

Other considerations only bolster this conclusion. Michigan aggressively enforces its laws, and has done so against two faith-owned businesses and Catholic Charities; the State has also received a complaint against a Catholic medical group. More, the laws are easy to enforce. Anyone can file a complaint against Sacred Heart. Michigan has even investigated and charged discrimination against a public accommodation based on social media posts. Accordingly, the school is justifiably chilling its activities to limit exposure.

Sacred Heart has standing and presents ripe pre-enforcement claims against Michigan's laws. Michigan's invocation of vague, someday exemptions do not prove otherwise. Because Sacred Heart's constitutional activities are at stake, it deserves a preliminary injunction. This Court should reverse the district court and order it to grant the school's requested injunction.

## ARGUMENT

### I. Michigan's brief bolsters Sacred Heart's credible fears that the State will enforce its laws against the school.

Michigan's laws violate Sacred Heart's free-speech, free-exercise, and religious-autonomy rights. The State primarily disputes that its laws injure Sacred Heart because, the State assures, the school has nothing to fear from the laws' application. Rather than assuage Sacred Heart's credible fears, however, the State has only compounded them.

#### A. Michigan admits that its laws apply to Sacred Heart and never disputes the school's understanding of how those laws apply.

Michigan's response confirms that its laws arguably prohibit Sacred Heart's constitutionally protected activities.

To start, Michigan admits that the Act facially regulates Sacred Heart as an employer and a public accommodation. Resp. Br. 20. Though Michigan avers that it's "unclear" whether the school qualifies as a public accommodation under the EAA, *id.*, that essentially admits that Sacred Heart is "arguably" a public accommodation under that law,

*see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). After all, the law applies to "*all* other places of public accommodation." MCL 750.146 (emphasis added). And Michigan courts consider this wording "comprehensive." *Vidrich v. Vic Tanny Int'l, Inc.*, 301 N.W.2d 482, 484 (Mich. Ct. App. 1980). All told, Michigan's concessions show that its laws *arguably* cover Sacred Heart.

More, Michigan never disputes that the laws apply against Sacred Heart's activities in exactly the ways the school detailed. The Act's Employment Provision prevents the school from hiring and retaining only faculty and staff who support, live, and model the Catholic faith. Opening Br. 25. The Education Provision forbids the school from requiring its students to abide by and model Catholic doctrine— including sex-specific uniforms, restrooms, and sports teams. *Id.* at 27– 28. Both the Accommodation Provision and the EAA require Sacred Heart to use self-selected, rather than sex-reflexive, pronouns. *Id.* at 29–30. And the Publication Bans make illegal certain statements Sacred Heart wants to post about its views on marriage and sexuality. *Id.* at 31.

At best, Michigan merely contends that Sacred Heart's fears derive from the school's "own interpretation." Resp. Br. 18. This sleight of hand says nothing about standing. That the interpretation might be Sacred Heart's own does not make it "[im]plausible." *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022).

It's also not true. In litigation after litigation, Michigan has taken similar positions on analogous laws. Br. of Cal. et al. as Amici Curiae in Supp. of Neither Party, *Tennessee v. Dep't of Educ.*, No. 22-5807 (6th Cir. Dec. 22, 2022), 2022 WL 18027407, at *2, 10–12 (arguing that "pronoun misuse," sex-specific uniforms, restrooms, and sports teams are discriminatory); Br. for Mass. et al. as Amici Curiae in Supp. of Pl.-Appellee at 18–25, *Billard v. Charlotte Cath. High Sch.*, No. 22-1440 (4th Cir. Nov. 30, 2022) (arguing that the states' interests outweighed church autonomy over its own faculty and staff); Br. of Mass. et al. as Amici Curiae in Supp. of Resp'ts, *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Aug. 19, 2022) (arguing that states can use public-accommodations laws to compel speech). No amount of legerdemain can cover up how Michigan reads its own laws.

Furthermore, though Michigan derides Sacred Heart's reading as its "own interpretation," the State never offers a counterinterpretation. The State could end this litigation by definitively declaring that its laws do not cover Sacred Heart's activities. That Michigan refuses to do so gives away the game.

Sacred Heart has shown that Michigan's laws arguably prohibit its constitutional activities, and that is all that is required to establish standing. *SBA List*, 573 U.S. at 157. Sacred Heart need not prove its "intended conduct is *in fact* proscribed." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022). The school simply must show its activities

"implicate[ ], if not violate[ ], each provision of the law at issue." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 451 (6th Cir. 2014) (cleaned up). And Sacred Heart has demonstrated that implication by offering a "*plausible* interpretation of the statute." *Kentucky*, 54 F.4th at 337; *accord 281 Care Comm. v. Arneson*, 638 F.3d 621, 628 (8th Cir. 2011) (standing where law "could reasonably be interpreted as" prohibiting plaintiffs' activities); Opening Br. 22–32.

In the end, Michigan—like the district court—conflates standing ("arguably" proscribed) with the merits ("actually" proscribed). That is inappropriate.

### B. Michigan did not dispel the presumption that it would enforce its laws against Sacred Heart.

The Supreme Court, this Court, and other circuits presume that a plaintiff faces a credible threat of enforcement when the plaintiff alleges an intent to engage in conduct arguably proscribed by law and the government refuses to disavow enforcement. As this Court has explained, the presumption makes sense, for "it is inconceivable that the government would enact a widely publicized law" and then "sit idly by" as it is violated. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 289 (6th Cir. 1997). Confronted with specific facts about how its laws stifle Sacred Heart's constitutional activities, Michigan continues to refuse to disavow enforcement.

If anything, Michigan repeatedly doubles down on its enforcement authority. The State claims there is "no authority" for a religious entity like Sacred Heart to be "immun[e] from suit, an investigation, etc., as religious freedoms must be weighed against governmental interests based on the particular facts of each case." Resp. Br. 24. Michigan also proclaims a "paramount" interest in applying its law "here." *Id.* at 56. That's the exact opposite of "*explicitly* disavow[ing] enforcing" the law "in the future," *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015) (emphasis added), and showcases the credible threat Sacred Heart faces, *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019) (consistent defense of a policy suggested future threat); *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 518 (D.C. Cir. 2009) (Kavanaugh, J.) (noting it was "ironic" for the government to argue a plaintiff "lack[s] standing" and then say it must apply the law to him).

Rather than address the presumption, Michigan instead hides behind a curtain that would eviscerate pre-enforcement challenges if accepted. The State insists that it "cannot generally disavow application of [its laws] where the statutes broadly prohibit discrimination" and can only do so in "fact dependent" circumstances as they come before the State. Resp. Br. 33–34. That ignores the specific facts that Sacred Heart has already provided in this case, such as the very speech it wants to publish but has chilled, or the Catholic doctrines it expects staff and

students to abide by. Michigan *can* disavow these as-applied challenges—it just chooses not to do so.

Michigan also tries to downplay Sacred Heart's credible fears by emphasizing that the school "has not been the subject of any action." Resp. Br. 1. For centuries, the Supreme Court has held that plaintiffs need not "take the risk of prosecution" before suing. *Terrace v. Thompson*, 263 U.S. 197, 216 (1923); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 (2007) (same). So Sacred Heart doesn't have to "first expose [itself] to actual arrest or prosecution … to challenge a statute" that deters its "constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Following Michigan's "be-prosecuted-now-and-ask-questions-later" approach would also erode pre-enforcement actions.

Indeed, courts have allowed plaintiffs to challenge unconstitutional laws before they were enforced against *anyone*. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (standing to challenge provision that had "not yet been applied"); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (standing "before the statute became effective"); *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 537 (6th Cir. 2011) (collecting suits filed three to thirteen years before law's effective date), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). Michigan's demand that the school first receive a complaint or some other enforcement notice cannot be squared with these decisions.

Michigan's second argument fares no better. Michigan attempts to distinguish other pre-enforcement cases, like *Green Party of Tennessee v. Hargett* and *Universal Life Church Monastery Storehouse v. Nabors*, by arguing that these cases involved "statutes that proscribe[d] very specific conduct." Resp. Br. 34. But neither case relied on a statute's specificity to prove a credible threat. This Court held that the plaintiffs in *Hargett* had standing because the government did not "explicitly disavow[ ] enforcing." 791 F.3d at 696. And the plaintiffs in *Nabors* had standing because the legislature had recently amended the law, and the defendants never gave "clear assurances that they will *not* prosecute … ministers." 35 F.4th 1021, 1035 (6th Cir. 2022). That's the entire affirmative credible-threat analysis from those cases (although these decisions spent time rejecting other arguments like Michigan's).

Michigan presses its second argument further. It says the enforcement presumption doesn't apply here because its laws "broadly prohibit discrimination," but have no "explicit ban on" activities like Sacred Heart's. Resp. Br. 33, 36. That just repackages Michigan's argument that its laws do not *arguably* proscribe Sacred Heart's activities. The school need not show an "explicit ban" to have standing.

The State's "explicit ban" argument also runs headlong into caselaw. In *Holder v. Humanitarian Law Project*, the Supreme Court held that the plaintiffs had standing to challenge the law as applied to "certain specified activities" related to their speech even though the law

broadly prohibited "training," "expert advice or assistance," "services," and "personnel." 561 U.S. 1, 14–15 (2010). Likewise, the plaintiffs in *Babbitt* had standing to challenge broad "unfair labor" laws as applied to their speech that prohibited "dishonest, untruthful and deceptive" statements. 442 U.S. at 301. They had standing even though they did "not plan to propagate untruths" and the law had never been applied before. *Id.* at 301–02.

Following these cases, many courts have held plaintiffs like Sacred Heart have pre-enforcement standing to challenge general anti-discrimination laws that do not mention specific activities in their text. *E.g.*, *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749–50 (8th Cir. 2019) (public-accommodations law); *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 924–30 (5th Cir. 2023) (employment law). For example, in *303 Creative LLC v. Elenis*, the Supreme Court held a website designer had standing to challenge a public-accommodations law, 600 U.S. 570, 580–83 (2023)—even though Colorado's regulations (like Michigan's, but more explicitly) required enforcement officials to "follow the interpretations and guidance established in State and Federal law, regulations, and guidelines," 3 Colo. Code Regs. 708-1:10.14(C). Rather than splitting with these circuit decisions, as Michigan suggests, this Court should abide by them and hold that Sacred Heart has standing.

**C. Even though Michigan rigidly misconstrues this Court's caselaw, Sacred Heart satisfies all that this Court has ever required for pre-enforcement standing.**

Though Michigan admits that "disavowal" weighs heavily "in [Sacred Heart's] favor," the State contends that disavowal is not enough under this Court's caselaw. Resp. Br. 33. That's wrong on both the law and the facts.

To start, this Court has never required rigid adherence to the factors spelled out in *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016). Michigan faults Sacred Heart for not satisfying "a combination of the factors" found in *McKay*. Resp. Br. 27, 33. But as this Court has clarified, the so-called *McKay* factors are neither "exhaustive," *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021), nor a "laundry list," *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam). Like the district court, Michigan is trying to squeeze more from these factors than this Court intended.

In any event, Michigan is wrong to suggest that Sacred Heart does not satisfy factors this Court has examined to assess a credible enforcement threat. Even applying the "commonly recurring factors" listed in *McKay*, Sacred Heart has shown a sufficient "combination" to establish a credible threat. *Fischer*, 52 F.4th at 307.

*Active enforcement.* Michigan never disputes that it actively enforces its laws. Instead, the State myopically suggests that, to have standing, Sacred Heart needed to show something more: that Michigan

11

actively enforces its laws against "similar entities."[1] Resp. Br. 36. This Court has never imposed that requirement. Just consider *Block v. Canepa*, 74 F.4th 400 (6th Cir. 2023). To establish a credible threat, the wine merchant in that case pointed to prior prosecutions for liquor and beer transportation—not wine transportation. *Id.* at 406. This Court *rejected* the very argument that Michigan now advances (and that the district court adopted): the merchant was *not* "obligated to show" that the state "prosecuted people for transporting wine, rather than liquor" to have standing. *Id.* at 410.

*Speech First* is of a piece. In that case, as Michigan admits, the challenged university policy involved "bullying and harassment," Resp. Br. at 30, yet the students wanted to engage in "protected speech"—i.e., *not* bullying or harassment, 939 F.3d at 766. Yet prior disciplinary actions "involving 'bullying' or 'harassing' misconduct" were still relevant to the university's active enforcement even though those actions involved dissimilar conduct from a merits perspective. *Id.*

The Supreme Court has never required enforcement history to bring a pre-enforcement challenge. *Babbitt*, 442 U.S. at 302. Yet

---

[1] Though not prosecuted by Michigan itself, a complaint has been filed against a religious university by a former employee, alleging sex discrimination under the Act. Br. of Calvin University as Amici Curiae in Supp. of Appellant, *St. Joseph Parish St. Johns v. Nessel.*, No. 23-1860 (6th Cir. Dec. 6, 2023).

Michigan would have this Court go further and require an enforcement history against a virtual twin. That would make it impossible to bring pre-enforcement challenges against most laws, especially newly enacted ones. After all, Michigan only recently reinterpreted and amended its laws to include sexuality and gender identity. When faced with new laws, other circuits do not require an exact comparator but instead give little weight to prior enforcement. *E.g.*, *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023). Given that Sacred Heart has identified numerous prosecutions, this Court doesn't even have to go that far.

Moreover, contrary to Michigan's suggestion, Sacred Heart *has* identified comparators. Complainants have tried to enforce the Act against religious schools. Opening Br. 38 (collecting cases). And in *Rouch World*, Michigan is prosecuting two faith-based businesses for declining to provide services that violated their religious beliefs. Michigan argued that the Free Exercise Clause did not protect the owners' religious beliefs because the Act regulates public accommodations in a "neutral and generally applicable" way. Michigan is also investigating Catholic Charities for alleged gender-identity discrimination. Mot. to File Suppl. Br. & Ex. A, R.34, PageID#788–809. And private parties have launched complaints against a Catholic health clinic. Mot. to Suppl. Record 4.

Somehow, Michigan sees the "transportation of wine" and the "transportation of liquor" as "the same, specific conduct," but rejects

that Sacred Heart's views about sexuality and gender identity are the "same" as those the State has prosecuted in other cases, such as *Rouch World*. This Court has already denounced this argument as "flawed" and should do so here, too.[2] *Block*, 74 F.4th at 410.

*Ease of enforcement.* Michigan's laws are easy to enforce. Opening Br. 39–40. Though Michigan conceded this point below, Defs.' MTD Reply, R.32, PageID#774–75, it now retreats from it, saying that the laws' respective savings clauses make them *difficult* to enforce against Sacred Heart. Resp. Br. 32–33. Not so. Michigan's argument implicitly suggests that only eventual outcomes work a constitutional injury. That ignores the chilling effect the threat of a burdensome investigation has on Sacred Heart's constitutional activities.

It also ignores this Court's cases. In *Cameron*, an association challenged a law that allowed private plaintiffs to file complaints; this Court found that challengers had standing even though the statute had a "safe harbor[ ]" provision. 995 F.3d at 551. The safe harbor provision did not "preclude enforcement actions and the associated costs" even

---

[2] Michigan also tries to distinguish *Block* by contending that "there was no indication in *Block* that Ohio's statute require[d] consideration of other laws." Resp. Br. 30. Not only does that fundamentally misunderstand the Supremacy Clause, U.S. Const. art. VI, para. 2, but it's also wrong: the wine merchant also raised a Commerce Clause challenge, *Block v. Canepa*, 74 F.4th 400, 406 (6th Cir. 2023).

"where the Attorney General's investigative actions are inconclusive."
*Id.* That was enough for standing there. So too here.

## II. Sacred Heart will suffer an ongoing hardship absent review now, and its claims are ripe.

Sacred Heart's claims are also ripe. Michigan notes the overlap between standing and ripeness. Resp. Br. 38–39. And Michigan concedes that it disputes ripeness "for the same reasons" it disputes standing. *Id.* at 39. Sacred Heart refutes these arguments elsewhere and need not duplicate them here. But the State raises two prudential questions unique to ripeness: (1) is the factual record sufficiently concrete, and (2) has Sacred Heart shown hardship absent judicial review? The answer to both questions is yes.

*Concreteness.* Start with the concrete facts. Sacred Heart pled in painstaking detail the public statements it wants to post and the policies it has and wants to enforce. It also pled how Michigan's laws arguably prohibit those activities. Not once has Michigan requested more facts about these statements or policies. In fact, the State has taken enforcement action against other entities based on much slimmer records.

Consider Studio 8 Hair Salon. In that prosecution, Michigan needed only a few social media posts to launch an investigation and subsequently file a discrimination charge. Sacred Heart has provided copious more detail here, outlining its practices, policies, and desired

15

public statements. That's more than a few sparsely worded social media posts. If Michigan can issue a discrimination charge based only on the latter, it has failed to explain why it—and this Court—can't evaluate whether Michigan's laws threaten Sacred Heart's ability to follow its policies and publish its statements. And while the Studio 8 proceedings started after Sacred Heart filed its complaint, ripeness focuses on "the situation now," not when the complaint was filed. *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974).

The Studio 8 prosecution highlights how Sacred Heart's challenge to the Publication Bans is ripe. That means the school's challenges to the Employment and Accommodation Clauses are ripe too. Michigan only restricts Sacred Heart's desired statements and policies under the *Publication Bans* because the *Employment and Accommodation Clauses* arguably proscribe the activities underlying those statements and policies. In other words, the Publication Bans depend on the other Clauses' definition of illegal activities. That intertwinement makes Sacred Heart's challenges ripe. *See 303 Creative*, 600 U.S. at 581 n.1, 598 n.5 (holding similar provisions worked together); *FEC v. Cruz*, 596 U.S. 289, 298–302 (2022) (holding plaintiff had standing to challenge statute and its implementing regulations because they operated in tandem).

Sacred Heart also presents independently ripe challenges to the Employment and Accommodation Clauses. Opening Br. 23–39.

Michigan says a court must "speculate" about whether someone "would complain about [Sacred Heart's] use of pronouns, separate restroom access, separate sports teams, publications, etc." Resp. Br. 44. Not so. The Studio 8 case shows Michigan prosecutes based solely on public comments. Moreover, the State can launch its own complaints *without* waiting on someone else.

Michigan hinges its ripeness challenge on supposed speculation about how "some type of action will be taken against Sacred Heart and how such an action might be resolved." Resp. Br. 45. But the State could say the same about *any* pre-enforcement challenge. By their very nature, pre-enforcement challenges occur *before* the state launches a formal investigation. That's why Michigan's vigorous enforcement history is so illuminating here. It highlights that Sacred Heart's fear isn't based on any speculation but on Michigan's active prosecution of its laws, public statements about its laws, and positions it has taken in current and prior cases.

*Hardship*. Sacred Heart faces significant hardship absent judicial review. Every day that this pre-enforcement challenge goes unresolved, Sacred Heart cannot post job listings consistent with its beliefs. It cannot, without fear of prosecution, enforce its own faith-based policies and procedures. And "[t]he loss of First Amendment freedoms, for even minimal periods of time," is a hardship that makes this case ripe.

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 408 (6th Cir. 2022) (cleaned up).

## III. Michigan's invocation of hypothetical exemptions do not defeat standing or make this case unripe.

The only hypotheticals in this case are the very ones Michigan repeats throughout its brief to defeat standing and ripeness: whether the State might one day exempt Sacred Heart from its laws. This latter-day possibility does not make this case unjusticiable.

### A. Fleeting savings clauses do not alleviate the credible threat Sacred Heart faces.

The Supreme Court, this Court, and other circuits have all concluded that plaintiffs have standing to challenge laws with explicit constitutional or statutory exemptions. Opening Br. 44–46. Michigan never mentions these cases, much less distinguishes them. But they all disprove Michigan's central argument that its laws pose no threat to Sacred Heart because they apply only "where permitted by law," subject to "conditions and limitations established by law," and consistent with other "civil rights." Resp. Br. 19, 21.

To make matters worse, Michigan isn't even sure whether "law" includes the Constitution. Michigan notes that "law," as used in its statutes, "does not appear to have been interpreted," but "it is reasonable to conclude that it … includes constitutional law." Resp. Br. 19–20. Yet Michigan then turns around and states that there "is no authority to support [that] a religious entity's religious rights provide it

with complete immunity from suit." *Id.* at 23. The Constitution says otherwise, and Michigan's hesitancy to even affirm the Constitution's application reveals how foolish Sacred Heart would be to trust the State to apply its laws consistent with the school's constitutional liberties.

In any event, whether the First Amendment protects Sacred Heart's activities—and therefore whether those activities are "permitted by law"—is a merits question, not a standing one. Michigan conflates the two throughout its arguments. But standing and merits are different questions, and "[r]arely do the twain meet." *Benalcazar v. Genoa Twp.*, 1 F.4th 421, 424 (6th Cir. 2021).

If courts lumped standing with the merits, "every losing claim would be dismissed for want of standing" rather than on the merits. *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021) (cleaned up). Put differently, the losing party would have no "legally protected interest" in the unsuccessful claim and so could not show an "Article III injury." *Id.* at 488–89 (cleaned up). Under Michigan's logic, every pre-enforcement action ending in an unfavorable merits decision should have actually been dismissed for lack of standing. That can't be right. *See Holder*, 561 U.S. at 12, 36–39 (finding standing but ruling against plaintiffs on the merits).

Michigan contests standing because Sacred Heart *might* be able to prove, post-enforcement, that the First Amendment protects its decisions on pronouns, uniforms, restrooms, sports teams, and

employees. In Michigan's words, Sacred Heart might show that its activities are "permitted by law." Resp. Br. 33. And if that's true, the argument goes, Sacred Heart's activities do not violate Michigan's laws, so the school faces no threat today.

That logic nullifies all pre-enforcement litigation. Minority political parties, anti-war protestors, and countless others would lack standing to challenge unconstitutional restrictions on their speech. *Contra Steffel*, 415 U.S. at 459; *Hargett*, 791 F.3d at 696. Lawful firearm owners would be unable to contest laws illegally regulating gun ownership. *Contra Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 531–39 (6th Cir. 1998). And successful efforts by unpopular speakers to strike down facially vague and overbroad laws would be refused on jurisdictional grounds. *Contra Dombrowski v. Pfister*, 380 U.S. 479, 486–89, 493–96 (1965). If accepted, Michigan's argument would deprive all these plaintiffs of standing because the First Amendment *might* protect them if government officials later filed suit. "But that would put the merits cart before the standing horse." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006). That's not how courts evaluate standing.

That Michigan's laws mention other "laws" doesn't change the analysis. As the Seventh Circuit plainly held, "statutory recognition of a First Amendment defense does not weaken the case for standing[,]" because that defense is always available "whether the statute refers to

it or not." *Brown v. Kemp*, 86 F.4th 745, 764 n.6 (7th Cir. 2023); *see* Opening Br. 47 (making same point). Michigan cannot downgrade Sacred Heart's First Amendment guarantees to a statutory gratuity, then duck out on the check when someone brings a pre-enforcement suit.

In the end, Michigan puts all its eggs in one basket: that the mere possibility of a religious exemption on the backend should put Sacred Heart's fears to rest on the front end. But constitutional rights are not "at the mercy of *noblesse oblige*." *Stevens*, 559 U.S. at 480. Courts do not "uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.*

More, Michigan's theory reveals that it views Sacred Heart's constitutional activities less as rights and more as things to "be weighed against governmental interests." Resp. Br. 23. But "[t]he First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs." *Stevens*, 559 U.S. at 470. In adopting the First Amendment, the Founders withdrew "certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943); *accord Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 61–62 (1961) (Black, J., dissenting) (concluding that the First Amendment "put the freedoms protected there completely out of the area of any congressional control").

It's no secret how Michigan would "weigh" Sacred Heart's liberty interests here. That's precisely why the First Amendment puts the decision beyond Michigan's reach.

### B. Michigan's cursory invocation of the BFOQ process does not defeat standing or make this case unripe.

Sacred Heart has already explained how Michigan's BFOQ process does not remedy its constitutional injuries—and, in fact, independently causes injuries of its own. Opening Br. 46–49. That process empowers Michigan officials to declare whether the school's employee positions are "religious enough" to qualify for First Amendment autonomy. And it allows those officials to decide whether the school's public communications about employment positions are orthodox. Additionally, Sacred Heart highlighted how Michigan has consistently rejected BFOQ requests for support staff, clerical positions, and maintenance personnel—positions like teacher's aides and custodians who must abide by Sacred Heart's religious beliefs and mission in order for the school to operate as intended.

Michigan never addresses these defects. Nor does the State concede that Sacred Heart's employees merit a BFOQ, despite a sufficient record to make that call. Instead the State repeatedly suggests that the school should go through this unconstitutional process in the hopes that the State might grant its request. "[I]n view of the nature of [its] claim," Sacred Heart's eschewal of this process "does not

defeat the justiciability of [its] challenge." *Babbitt*, 442 U.S. at 299; *see Cruz*, 596 U.S. at 298 (similar).

Michigan cites a handful of state court cases that supposedly applied religious exemptions but, upon scrutiny, offer little assurance to Sacred Heart. In two cases, the Michigan courts applied the ministerial exemption using factors that the United States Supreme Court has explicitly rejected. *Compare Weishuhn v. Cath. Diocese of Lansing*, 756 N.W.2d 483, 500 (Mich. Ct. App. 2008) (listing four factors including involvement with liturgy and "worship") *and Assemany v. Archdiocese of Detroit*, 434 N.W.2d 233, 238 (Mich. Ct. App. 1988) (similar as applied to employee with "pastoral-liturgical leadership role") *with Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2066–67 (2020) (refusing to analyze ministerial status "as checklist items to be assessed and weighed against each other in every case").

Another of Michigan's cases relied on a now-defunct application of the federal Religious Freedom Restoration Act. *Compare Porth v. Roman Cath. Diocese of Kalamazoo*, 532 N.W.2d 195, 198 (Mich. Ct. App. 1995) *with City of Boerne v. Flores*, 521 U.S. 507 (1997) (invalidating RFRA as applied to state law). That's certainly not reassuring. And in the final case, the religious claimant *lost*. *McLeod v. Providence Christian Sch.*, 408 N.W. 2d 146, 150–53 (Mich. Ct. App. 1987).

In the end, Michigan's cases prove the opposite point for which they were cited—Sacred Heart cannot rely on Michigan, its faulty imposition of a balancing test to the ministerial exemption, or outdated and factually inapplicable state-court decisions to safeguard the school's constitutionally protected rights. That just underscores why Michigan is wrong to require the ministry to endure the BFOQ process. There is a reason most other states in the Union offer broad exemptions for religious organizations rather than apply Michigan's position-by-position BFOQ system. Sacred Heart need not submit to this process before requesting relief in federal court because "Congress has assigned to the federal courts" a "paramount role" to "protect constitutional rights." *Steffel*, 415 U.S. at 472–73. Sacred Heart needs that protection now so that it can continue to serve its community consistent with its religious beliefs.

## IV.  Sacred Heart deserves a preliminary injunction because it meets all the required factors.

Michigan does not dispute that Sacred Heart will succeed on the merits of its challenge. It merely "[a]ssum[es] for the sake of argument" the school's likelihood of success on the merits. Resp. Br. 53. By "not addressing the merits at all," Michigan "has forfeited any further argument about likelihood of success." *Fischer*, 52 F.4th at 310.

Sacred Heart is chilling its constitutionally protected expression to avoid prosecution. Opening Br. 31–32. That's an irreparable harm.

*Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012). And the public "always" benefits from injunctions that stop constitutional violations; the government has no legitimate interest infringing those rights. *Id.* (cleaned up); *see also* JCRL *Amici* Br. 5–29. The requested injunction doesn't stop Michigan from generally pursuing any legitimate non-discrimination interests. It only prevents Michigan from violating Sacred Heart's constitutional rights.

This Court has the "discretion" to order the preliminary injunction now. *Harris v. Klare*, 902 F.3d 630, 635–36 (6th Cir. 2018). Sacred Heart has presented the issues "'with sufficient clarity and completeness and [their] resolution will materially advance the progress of … protracted litigation.'" *In re Allied Supermarkets, Inc.*, 951 F.2d 718, 725 (6th Cir. 1991) (quoting *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988)). If this Court remands without ordering an injunction, as Michigan argues for, then the issue will again come before this Court on appeal from a preliminary-injunction order. And when it does, this Court would need "to conduct an independent examination of the record as a whole, without deference to the trial court" because Sacred Heart raises First Amendment claims. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995). This Court can and should conduct that review now. *Cf. Doe v. Sundquist*, 106 F.3d 702, 707 (6th Cir. 1997) (reaching definitive

merits on preliminary-injunction appeal "in the interest of judicial economy").

## CONCLUSION

The only way Sacred Heart can freely speak and serve the needs of its community without the threat of government punishment is for this Court to reverse the district court and remand with instructions to enter the requested injunction. Because Sacred Heart has standing to challenge Michigan's laws, this Court should do so.

Dated: January 5, 2023

Respectfully submitted,

*s/Cody S. Barnett*

David A. Cortman
Ryan J. Tucker
Katherine L. Anderson
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
dcortman@ADFlegal.org
rtucker@ADFlegal.org
kanderson@ADFlegal.org

Cody S. Barnett
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cbarnett@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

*Counsel for Plaintiffs-Appellants*

**FRAP 32(g)**
**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,798 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: January 5, 2023

*s/Cody S. Barnett*
Cody S. Barnett

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Cody S. Barnett*
Cody S. Barnett

*Counsel for Plaintiffs-Appellants*